*Decisions will be entered under Rule 50.*

NORTHWEST ACCEPTANCE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4846–70.   Filed August 14, 1972.

*Frederick H. Torp* and *Harry S. Chandler*, for the petitioner.
*Gary R. De Frang*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's income taxes in the amounts of $38,592 and $244,931 for the taxable years ended April 30, 1966, and April 30, 1967, respectively. The sole issue for our decision is whether petitioner is entitled to depreciation deductions and investment credits for equipment placed in the possession of its customers under the terms of certain contracts which are purported to be leases.

FINDINGS OF FACT

The stipulated facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Northwest Acceptance Corp. (hereinafter sometimes referred to as petitioner or NAC) is an Oregon corporation formed in 1958 with its principal office and place of business in Portland, Oreg. Petitioner duly filed Federal corporate income tax returns for its fiscal years ending April 30, 1966 and 1967, with the district director of internal revenue, Portland, Oreg., reporting its income on an accrual basis.

Petitioner is a sales finance company. Since about 1965 its principal business has been the purchase of contracts from heavy equipment and other capital goods dealers. The bulk of the contracts concerns motor-trucks, heavy-duty construction equipment and logging towers, and related machinery, placed in the possession of the user. Petitioner designates the documents as either "security agreements" or "leases." [1] The security agreements are essentially conditional sales contracts resulting from the purchase of capital goods by a user. Until 1965 petitioner was engaged solely in the acquisition of this type of contract. With respect to the contracts identified as leases, petitioner either receives by assignment the dealer's interest in the original lease or acquires title to the equipment from the dealer and is identified as lessor in the instrument.

For the fiscal year ended April 30, 1966, petitioner acquired a total of $25,728,862 of security agreements and leases from all dealers.[2] In the following year petitioner acquired from all dealers $18,114,790 of security agreements and leases, of which $14,542,467 constituted balances due on security agreements and $3,572,323 balances due on lease agreements.

During the years involved herein, petitioner had branch offices in Eugene, Oreg., Redding, Calif., and Seattle and Spokane, Wash. Pe-

---

[1] The terms "lease," "lessee," "lessor," and "rent," as used in the Findings of Fact, are not intended to indicate the character of the transactions in question, but instead are used solely for purposes of clarity and convenience.

[2] On Dec. 1, 1965, petitioner began keeping its records on a computer and has available the gross balances of security agreements and leases acquired from various dealers only since that date.

titioner financed its business operations by obtaining the large sums of money it needed from banks and life insurance companies. At no time during the years in question did petitioner have an inventory of equipment to lease, or storage or maintenance facilities for such equipment.

In 1966 and 1967 Automotive Equipment Co. of Portland (hereinafter referred to as Automotive) was a distributor of heavy-duty trucks and related equipment and parts with offices in Portland and Eugene, Oreg., and Seattle, Wash. Through its subsidiaries, Motor Truck Distributors Co. and Shasta Truck & Equipment Co., Automotive also engaged in such business in, respectively, Los Angeles and Redding, Calif. Substantially all of the contracts created by Automotive with respect to the distribution of equipment, except those created in Los Angeles, Calif., were sold by Automotive to petitioner.

During NAC's 1966 and 1967 tax years, Louis Courtemanche, Jr., and members of his family held all of its capital stock, with the exception of its preferred stock held by an institutional investor. Also, during the same period, they owned all of the outstanding stock of Automotive. Members of the Courtemanche family, as corporate officers and as stockholders, played a dominant role in the management of both NAC and Automotive.

In 1965, when petitioner began transacting some of its business as leasing operations, the company officers instituted a program in which potential customers had a choice of three types of standard lease arrangements or a custom lease arrangement.

Petitioner's standard lease arrangements are executed on printed forms designated L–1, L–2, or L–3.[3] All of the forms contain the following provisions:

(a) Identification of the lessee, lessor, and property subject to the lease.

(b) Designation of the lease term, total rentals, advance rentals, and monthly rentals.

(c) Identification of the geographic area where the equipment is to be used or located.

(d) The lessee's duty to inspect the equipment to determine its condition within 48 hours of delivery.

(e) The lessor's right to enter the lessee's premises to inspect the equipment and observe its use.

(f) The lessee's duty to have the equipment operated only by competent employees.

(g) The lessee's duty to obtain written permission from the lessor before making alterations to the equipment.

---

[3] There are 94 of these contracts in question; 56 lease arrangements were transacted on form L–1, 4 on form L–2, and 34 on form L–3.

(h) The lessee's duty to keep the equipment in good repair at its own expense, furnishing parts and labor.

(i) The lessee's assumption of the entire risk of loss and damage to the equipment.

(j) The lessor's right of indemnification from the lessee for all claims connected with or resulting from the delivery, use, possession, maintenance, or return of the equipment. The lessee's duty to provide liability insurance on the equipment with the lessor named as the insured.

(k) The lessee's duty to provide theft and fire insurance for the equipment.

(l) The lessee's duty to comply with all laws and pay all license fees, taxes, and assessments relating to the ownership, possession, and use of the equipment. The lessee's duty not to mortgage the equipment.

(m) The lessor's right to perform the neglected duties of the lessee and demand repayment plus interest.

(n) The lessor's retention of legal title to the equipment. The lessee's duty to surrender the equipment in good condition, at the expiration of the lease.

(o) The lessor's disclaimer of all warranties, either express or implied, including those concerning the equipment's condition, its merchantability or fitness for any particular purpose.

(p) The lessor's right to assign the rents from the lease and to prohibit lessee from subletting the equipment without prior written consent.

(q) The lessor's right upon the lessee's default on any of the lease covenants to declare all rentals under the lease due and to repossess the equipment.[4]

(r) The lessor's right to attorney's fees incurred to enforce the lease and to interest on delinquent rent.

(s) The lessee's option to purchase the equipment upon its payment of all rental payments.[5]

(t) Provision for a third party to guarantee the lessee's performance under the lease.

The standard lease contracts in question generally cover one or two pieces of new or used heavy-duty equipment and provide rental periods of from 14 to 61 months. However, there are five contracts con-

---

[4] Form L-3 provides additionally for a damage formula in the event the lessee defaults on the lease.

[5] Contract form L-2 provides for the purchase option at the same place in the lease that the rental payments are enumerated, while L-1 and L-3 provide for the option at the end of the lease. Additionally, L-2 provides, "The total purchase price shall be deemed to be the amount herein specified as aggregate rentals, plus $———— [the option price], which purchase price shall be deemed to include a finance charge of $————. The cash sale price, if it were paid upon a sale on the date of the execution hereof, shall be deemed to be $————."

cerned with office or medical equipment. NAC is named as the original lessor in 68 of the 94 standard lease contracts, and various equipment dealers are named as the original lessors in the remaining agreements, which have been assigned to NAC by the respective dealers, together with the transfer of title to the underlying equipment.

The option purchase prices contained in the form contracts reflect a percentage of the initial cost of the equipment to petitioner. Of the 94 standard contracts acquired during the years involved herein, 78 contain an option purchase price of approximately 10 percent of the original cost of the equipment to petitioner. The other 16 contracts have option purchase prices ranging from 12 to 35 percent.

Generally, rental payments under the contract terms are equally spaced over the lease term with an advanced payment of 1 month's rent or the first and last month's rent required.[6] The rental payments are based on a percentage of the equipment's original purchase price, or its fair market value at the contract date if the equipment is used, less an estimated residual value of the equipment at the end of the contract term. The size of the percentage is based primarily on the term of the contract, but petitioner's officers also have considered the type of equipment involved, whether the equipment is new or used, and the particular use to which the equipment is to be subjected. Rental payments on equipment leased in Idaho, Washington, and California also include sales and use taxes required for leased equipment. Additional charges are made under several contracts for collision and credit life insurance. Seventeen of the contracts for equipment used by logging and construction businesses provide that rental payments will not be required for the 3 or 4 months of the year when those businesses are generally inactive, unless the equipment is actually operated in those months.

The guaranty contained in the form contracts guarantees payment of the rental amounts provided in the agreement, damages upon default, and those amounts that would become due if the customer exercises its option to purchase the leased property and thereafter defaults on the payment. An attempt was made to obtain personal guaranties of all contracts, but no guaranty was obtained on 32 contracts. The standard form guaranty, executed either by individuals involved in the business of the customer or by a dealer involved in the transaction, or a similar guaranty contained in an assignment of the lease by the dealer to petitioner, was obtained on 62 contracts. Of those 62 contracts, 44 are guaranteed by dealers. In 12 of the 44 contracts, the dealer from whom the equipment was acquired specifically guarantees payment of

[6] There are six leases where the amount of the advanced payments was not determined according to the usual practice. Additionally, there are three leases which require monthly rentals in varying amounts during various periods in the contract term.

the option price to petitioner if the lessee's option is not exercised. The guaranties were executed at the time the contracts were consummated or at or about the time the equipment was assigned to petitioner.

Equipment under lease in three separate form contracts had to be repossessed by petitioner within a year from the execution of the agreements. However, all three of the agreements were guaranteed by dealers and as a result NAC, upon disposing of the equipment, recognized a net capital loss of only $2,139.

NAC holds several documents which purport to be leases but which it treats as sales for purposes of taxation. Additionally, the language in several letters and documents concerning purported lease transactions refer to "finance charges," "interest," "principal," and other such terms often used in sales transactions.

During the 1967 tax year petitioner also acquired, by assignment from Automotive, 41 contracts which it characterizes as custom leases. These instruments were individually typed out for each of the four customers involved, i.e., Ronald Lentz Logging, Inc., Brooks, Scanlon, Inc., Brand-S Corp., and Rosboro Lumber Co., rather than appearing on the printed forms utilized for the standard contracts.[7] Additionally, petitioner entered into a custom contract arrangement with Raymond E. Oechsli, in which it purchased a used Cessna airplane and leased it to him. This contract was negotiated by petitioner in 1965.

Generally, the provisions of the custom contracts and the equipment subject thereto are similar to the standard contract arrangements. However, there are some exceptions.

Custom contracts with three of the customers, i.e., Ronald Lentz Logging, Brand-S Corp., and Rosboro Lumber, do not contain an option to purchase the equipment at the end of the rental term. However, in two of the customers' contracts, Ronald Lentz Logging and Rosboro Lumber, Automotive is obligated to repurchase the machines at the expiration of the rental term.[8] The Brand-S Corp. agreements have no purchase option and no dealer repurchase provision.[9]

All of the custom contracts acquired from Automotive have provisions concerning the required condition of the tires on the rented equipment when it is returned to NAC. Automotive guarantees the

---

[7] Of the 41 custom leases acquired, 20 named Rosboro Lumber as lessee, 4 named Brand-S Corp. as lessee, 16 named Brooks-Scanlon as lessee, and 1 named Ronald Lentz Logging as lessee.

[8] The dealer repurchase agreement in the Ronald Lentz Logging contract states a purchase price which is 63 percent of petitioner's original cost. The Rosboro Lumber contracts state the dealer repurchase prices as 31 percent of the original cost of the trucks subject thereto and 55 percent of the original cost of the trailers.

[9] The Brand-S Corp. contracts reflect a 31-percent residual value in the equipment at the end of the rental term.

The Brooks-Scanlon contracts which do have a purchase option state a purchase price of 30 percent of the original cost of the trucks subject thereto and 57 percent of the original cost of the trailers.

rent payments in all the agreements. The Brand-S Corp. contracts and Brooks-Scanlon contracts permit substitution of equipment. None of the custom contracts acquired from Automotive contains the warranty disclaimers that are included in the standard form contracts. The Ronald Lentz agreement can be terminated on the loss or destruction of the rented equipment if rent equal to the fair market value of the equipment has been paid. Finally, under the Rosboro Lumber contracts, the lessee can assign its rights under the agreements but it remains responsible for the obligations therein.

Petitioner provides metal tags labeled "Property of Northwest Acceptance Corporation" which are required to be attached to all leased equipment. Additionally, petitioner obtained certificates of title for motor vehicles under contract where required by State authorities and filed UCC financing statements for equipment not covered by certificates of title.

In summary, of the 136 contracts in question, 111 contain an option for the lessee to purchase the equipment during or at the end of the rental term, and 21 contain or are accompanied by dealer agreements to repurchase the equipment at the termination of the contract. Additionally, of the 111 instruments with purchase options, 29 contain dealer or third-party guaranties for full payment of the rentals due under the agreement and exercise of the purchase option. An additional 75 contain guaranties for rental payments only.

Petitioner maintains two sets of books for the management of its business affairs, the regular operating books and another set kept for tax purposes. The entries in petitioner's regular books and records at the end of its 1966 and 1967 tax years differ from those in the books used for tax-reporting purposes in several respects. The regular books contain an account for notes and contracts receivable, which encompasses lease payments not received, the salvage value of leased equipment, deferred-income charges which include the purchase option amounts in contracts containing such an option, and service charges earned during the year which include a portion of the customer's lease payments received during the year. The books used for tax-reporting purposes do not contain this account. However, they do contain accounts entitled leased equipment and depreciation of leased equipment, whereas the regular books do not.

Petitioner has a reason for recording its security agreements and lease contracts in the same manner in its regular operating books. Information from these books concerning all NAC-owned contracts is used by petitioner's accountants to compose financial statements for its shareholders and creditors. The accounting method employed by petitioner in its operating books makes NAC appear more profitable than

the accounting method used in its tax books. Petitioner's creditors prefer the accounting method used in its operating books.

Additionally, upon acquisition of a lease, petitioner establishes an accounting ledger card which allocates the expected profits from the total rental payments to finance. During its 1966 and 1967 tax years, information with respect to all leases was maintained on these separate schedules which disclosed, among other things, information contained in the contract, the contract number, depreciation taken on the equipment, and unearned finance.

On its Federal corporation income tax returns for the 1966 and 1967 tax years, petitioner reported its income from the lease contracts as rental income, and claimed depreciation deductions and investment credits as the owner of the leased equipment. Petitioner computed depreciation on the equipment subject to leases, for the 1966 tax year, by assigning a useful life to each piece of equipment, for tax purposes, which was equal to the term of the lease. For the 1967 tax year, petitioner computed depreciation on new equipment by assigning a useful life of 5 years to each piece of equipment without regard to the term of the lease. In 1967, petitioner gave the used equipment subject to leases a useful life of 3 years or the term of the lease, whichever was longer.[10] Additionally, on Schedule D of its Federal income tax return for the 1967 tax year, petitioner reported gains and losses from the disposition of equipment which had been subject to leases.

In his notice of deficiency, respondent denied petitioner's depreciation deductions and investment credits on equipment subject to the contracts herein at issue. Furthermore, respondent disallowed petitioner's capital loss deduction for the fiscal year ended April 30, 1967, which resulted from the sale of some equipment subject to the contracts. Finally, respondent eliminated rental income recognized by petitioner from the contracts during the years at issue and instead credited petitioner with income from service charges and other financial transactions. The basis for respondent's adjustments is as follows:

It is determined that, in all transactions involving the receipt by you of the instruments which you purport to be leases, ownership of the chattel covered by the instruments is with the other party or parties to the transactions. Furthermore, it is determined that the subject instruments (whether cast in the form of leases, conditional sales contracts, security agreements, or chattel mortgages) are received and held by you merely as security for fulfillment of the obligations of the other contracting parties to you.

---

[10] The parties have stipulated that depreciation and investment credit claimed on equipment with respect to which this Court may determine that petitioner is entitled to an allowance for depreciation, shall be recomputed to allow 6 years' useful life on new equipment using the double-declining-balance method, and 3 years or the life of the lease, whichever is longer, on used equipment using the straight-line method.

OPINION

We are asked to decide whether petitioner is entitled to investment credits under section 38, I.R.C. 1954,[11] and depreciation deductions under section 167 on the capital goods subject to the contracts herein at issue. The rationale for both allowances is the same and in this case requires a determination of the nature of the documents in question, viz, whether they are leases or sales contracts.

Respondent contends, first, that all of the disputed documents are conditional sales contracts, that petitioner does not own the equipment subject thereto, and thus is not entitled to the claimed investment credits and depreciation deductions. In support of his position respondent argues that under the contracts petitioner's customers assume the burdens of ownership of the equipment; petitioner's operating books and records characterize the transactions as conditional sales; a portion of the contracts' payments represents interest; the purchase options in the contracts set out a price substantially below the anticipated fair market value of the contracted property at the dates the agreements were consummated; and the sum of the contracts' periodic payments plus the option prices approximates the cost of the equipment to a buyer under a deferred-payment plan.

As a collateral argument, respondent contends that aside from the questionable nature of the contracts petitioner has so thoroughly divested itself of the economic risks of ownership in the concerned equipment it should be denied the benefit of the claimed deductions.

Petitioner, on the other hand, contends the documents are clearly financial leases, in form and substance, and that it is subject to sufficient proprietary risks to justify the claimed investment credits and depreciation deductions. Petitioner defends its position with the argument that it is engaged in the financial leasing business the transactions of which should not be characterized by guidelines promulgated in Rev. Rul. 55-540, 1955-2 C.B. 39, and early cases which deal only with operating leases. Petitioner further asserts that the presence of the purchase options and the third-party guaranties or repurchase agreements in the contracts is characteristic of financial leases and does not alter the substance of the transactions which is essentially leasing, as this Court held under similar circumstances in *Lockhart Leasing Co.*, 54 T.C. 301 (1970), affd. 446 F. 2d 269 (C.A. 10, 1971).

At the outset, we direct our attention to petitioner's argument which stresses that the contracts are "financial leases" and not "operating leases." The argument continues that financial leases are a relatively

[11] All section references are to the Internal Revenue Code of 1954, unless specifically designated otherwise.

new phenomenon in the business world and thus should be judged in light of current hybrid financing and rental techniques and not evaluated under the criteria outlined in Rev. Rul. 55–540 or the earlier court cases which make no such distinction. We are not persuaded by this argument and feel constrained to point out that there have been no provisions made in tax law for special consideration to be given to hybrid leases which tend to place the residual rights of the rented property in someone other than the lessor. In the tax realm, such contracts are either leases or they are not, and we make that determination based on tests enunciated in our prior decisions. Our research has produced cases decided as early as 1928 which deal with contracts containing most, if not all, of the relevant provisions written into the agreements under our consideration. See, for example, *Lockhart Leasing Co., supra; Truman Bowen*, 12 T.C. 446 (1949) ; *Judson Mills*, 11 T.C. 25 (1948) ; *Holeproof Hosiery Co.*, 11 B.T.A. 547 (1928). Furthermore, the authorities cited by petitioner to support its argument deal primarily with the general commercial aspects of leasing instead of the tax aspects. It is also worth mention that each of the works cited by petitioner in this regard clearly shows the author's awareness of the fact that all purported leases are evaluated by the same standards to determine their true character for tax purposes, regardless of their classification by the commercial world.

All of the 136 contracts in question are clearly written in the technical vernacular common to property leases. Additionally, there are many provisions present in the documents which are common to equipment leases as well as sales contracts. However, as we have noted in numerous prior opinions, the substance of the transaction, not the form, is the touchstone by which we determine how it will be treated for tax purposes. We are concerned more with the practical effect of the transaction than with its technical effect. *Karl R. Martin*, 44 T.C. 731 (1965), affd. 379 F. 2d 282 (C.A. 6, 1967) ; *D. M. Haggard*, 24 T.C. 1124 (1955), affd. 241 F.2d 288 (C.A. 9, 1956) ; *Truman Bowen, supra.* Accordingly, we will look to all of the facts and surrounding circumstances to determine the intent of the parties as revealed in their actions and statements, and the economic realities of the transaction. In making the inquiry, we look to the facts as they existed at the time the agreements were made and not to how they appear in retrospect. *Breece Veneer & Panel Co.* v. *Commissioner*, 232 F. 2d 319 (C.A. 7, 1956), reversing 22 T.C. 1386 (1954).

Petitioner relies heavily on *Lockhart Leasing Co., supra*, and urges that it is controlling in fact and law. Respondent, to the contrary, argues that *Lockhart* is clearly distinguishable. Certainly, the basic issue resolved in *Lockhart* is identical to the one confronting us. Likewise,

the factual circumstances in both cases are nearly congruous. There are several dissimilar aspects in *Lockhart*, but we are not convinced that they are of significant substantive value in this particular case.

Taxpayer in the *Lockhart* case was a corporate subsidiary engaged solely in leasing operations, though its parent was a finance company. All of the lease arrangements were made on printed form contracts which contained most of the provisions generally found in equipment leases. Additionally, 29 percent of the leases had purchase options with prices set at approximately 10 percent of the original cost of the equipment to the lessor. Lessees under the contracts with no purchase options would often negotiate purchase of the rented machinery at the end of the lease term. In 10 percent of the leases Lockhart obtained a guaranty from a third party that the lessee would perform its obligations under the lease, and in one other lease the lessor obtained a third-party guaranty to buy the equipment under contract if the lessee failed to perform its obligations. The property subject to the leases was essentially heavy-duty-type equipment. Lockhart's bookkeeping procedures included entries, with the acquisition of each new lease, in accounts entitled "leases receivable" and "unearned income." Such accounting procedures facilitated the preparation of financial statements by Lockhart which it had to present periodically to its creditors.

The facts of the instant case disclose that NAC was exclusively in the financial lending business before offering its lease arrangements in 1965, and since then it has continued to carry a great deal of its business in the form of loans. NAC has 94 purported leases outstanding which were executed on form documents and 42 which were individually drafted. Of the 136 leases in question, 111 contain purchase options and an additional 21 contain or are accompanied by dealer agreements to repurchase the equipment at the termination of the lease. A total of 29 leases contain dealer or third-party guaranties for full payment of the rentals due under the agreements and exercise of the purchase option. An additional 75 leases guarantee payment of only the rentals. Forty-one of the custom contracts reflect a residual value of the equipment in excess of 30 percent of its original cost. All of the form contracts have purchase options and of those, 78 state a 10-percent option price while 16 require an option price that exceeds 10 percent. The accounting procedures employed to keep NAC's operating books do not clearly disclose the company's leasing business, but the tax books do make such a distinction. NAC's lenders require the company to keep its operating books as it does for it gives the company a more profitable appearance.

The factual issue presented here is an extremely close one, making the decision difficult. However, after carefully weighing all of the

evidence in the record, we believe the relevant facts in the instant case sufficiently resemble those in *Lockhart Leasing Co., supra,* to require a holding that all of the contracts are leases.

To distinguish the *Lockhart* case, respondent relies heavily on the fact that the majority of the contracts contain purchase options with low prices, plus the fact that exercise of the options is guaranteed by a dealer, or where there is no option the contracts are accompanied by a dealer repurchase agreement. Thus, respondent maintains the petitioner has no realistic residual interest in the equipment because the generous option price will almost certainly be exercised by the lessee, or, in the event that it is not, the dealer or some third party will relieve the petitioner of the risks involved in disposing of used machinery through performance of its guaranty to purchase the discarded piece at the contracted option price. These provisions, he maintains, show an intent to bring about a sale of the equipment under contract. They show, more specifically, an initial intent on the part of the parties to effect immediate use of the equipment with eventual transfer of title to the user.

Similar provisions were present in the *Lockhart* case, except possibly to a lesser extent. As we concluded in that case, we cannot agree with respondent's contention, for the transactions here appear to be more than just another disguised procedure for sales financing. It is true that a lease may be distinguished from a sale in that the former contemplates purchase of the use of the item while the latter contemplates transfer of title to the item, but we cannot say that the absence or presence of the purchase options and the guaranties alone is enough to determine petitioners' intent. There are generally too many other extenuating provisions existent in transactions of this nature which can create the economic result of a sale or lease without bearing all of the trappings. With this in mind, we have reached the conclusion after considering all of the evidence that petitioner did honestly intend and believe that it was engaged in the leasing business, and that the ultimate goal and effect of the contracts at issue herein was to sell the customer the use of the equipment and not to sell the equipment itself. Moreover, we believe that that will be the actual result brought about by the contracts.

Therefore, the presence of the purchase options in most of the contracts and the dealer repurchase agreements in the remaining contracts, is not fatal to petitioner's position. *Kitchin* v. *Commissioner,* 353 F. 2d 13 (C.A. 4, 1965), affirming a Memorandum Opinion of this Court; *Lockhart Leasing Co., supra; Norman Baker Smith,* 51 T.C. 429 (1968). Here, where the option prices range from 10 percent to over 50 percent of the original cost of the equipment, there is cer-

848

tainly more than a mere nominal option price in the contracts, and we cannot find that the purpose of the options was to give the lessee an equity in the equipment or to make the ultimate purchase of the machine by the lessee an absolute certainty.[12] We agree that in retrospect the option prices in some of the contracts were generous indeed, even to the point of encouraging the lessee's purchase of the equipment at the end of the lease term. Nevertheless, we are convinced that though generous, the substantial option prices were intended to do no more than extend a privilege to customers of petitioner for their leasing business, which concomitantly gave rise to an advantage for NAC in that it did not have to contend with disposal of the used machinery if the options were exercised. The option price set at the commencement of each lease was not, therefore, intended to force the lessee into an economic position such that it would have to exercise the option to make the lease a profitable venture. Furthermore, the options did not remove all risks of depreciation from the petitioner, for the lessees were in no way bound to exercise the option and, in the event the equipment was worth less than the option price at the option date or the lessees had no further use for it, they clearly were free to decline their right.

Likewise, we find, as we did in the *Lockhart* case, that the presence of the dealer and third-party guaranties with regard to exercise of the options and payment of the rent under the contracts does not conclusively establish that petitioner intended to sell the equipment to the lessee. The guaranties do not bind the lessees to purchase the equipment and petitioner's efforts to obtain them merely indicate its desire to make certain that the rented equipment would be disposed of with a minimum of effort and risk of loss should the residual value of the equipment be less than estimated at the time the lease was arranged. This strikes us as demonstrating no more than good business sense on the part of the petitioner. Furthermore, NAC was not bound by the guaranties since it was completely free to disregard them and repossess the equipment for itself should the fair market value at lease end exceed the option price and the lessee fail to exercise its option.

Contrary to the position taken by respondent, we find that the accounting procedure employed by NAC is not decisive with regard to the intent of the parties bound to the leases. See *Earl L. Lester*, 32 T.C. 711 (1959). Though the operating books do fail to distinguish between leases and sales, that difference is made crystal clear in the company's tax books. Moreover, there is a perfectly legitimate reason

---

[12] See *Quartzite Stone Co.*, 30 T.C. 511 (1958), aff'd. 273 F. 2d 738 (C.A. 10, 1959), and *Fredrick V. Johnson*, T.C. Memo. 1962–209, where the option price was $1 and thus considered to be nominal.

for the bookkeeping procedure, i.e., the procedure is a requirement imposed on petitioner by its lenders.

Finally, we are not persuaded by respondent's arguments that part of the rental payments represents interest, and the sum of the contracts' periodic payments and option price approximates the cost of the equipment to a buyer under a deferred-payment plan. The former argument is of little merit for the reason that it is no more than a play upon words. In the tax sense, the term "interest" is generally associated with the use of money. *Deputy* v. *du Pont*, 308 U.S. 488 (1940). To the borrower it is the cost of such use and to the lender it is his profit. In business parlance, however, the term is a pervasive one and can mean several things including the profit derived by a seller on the outstanding balance of a purchase price or that part of a lessor's rental receipts which represents profit, viz, that portion of the rental payment over and above the sum required to be set aside for depreciation and management of the leased property. Thus, the contention that NAC received interest for the use of its property is an erroneous allusion to form and we have previously established that substance controls.

The latter argument with regard to the fact that deferred-payment purchase plans generate costs which approximate the sum of the rental payments plus the option price in the lease is inapposite. In the first place, there is some evidence in the record that under the lease agreements the lessee would have to pay ½ to 1 percent more on the cost of the equipment for its use and eventual acquisition through exercise of the purchase option than it would cost under a deferred-payment purchase plan. In terms of actual dollars, this difference is clearly significant when the parties are negotiating the use of equipment valued from $10,000 to over $300,000. Secondly, since the responsibilities of the lessee under a lease of this nature are similar to those borne by a vendee under a conditional sales contract, it is not extraordinary that the total cost of each plan is approximately the same. However, this is not to say that because the two types of contracts require similar responsibilities they are expressions of the same intent.

Respondent's collateral argument that petitioner does not have sufficient economic interest in the leased equipment to justify the investment credits and depreciation deductions is based on two cases, *Edith Henry Barbour*, 44 B.T.A. 1117 (1941), reversed on other grounds 136 F. 2d 486 (C.A. 6, 1943), certiorari denied 320 U.S. 778 (1943) ; and *Frederick Kinzler*, T.C. Memo. 1962–62. Both cases, however, are clearly distinguishable for the taxpayer in each stood no risk of investment loss for the years in which the depreciation deductions were claimed. In both instances the taxpayer was guaranteed a sale of the

rented property at the end of the rental term at a price equal to the fair market value of the property or the taxpayer's investment at the beginning of the rental term. On the other hand, in the instant case the sales prices under the dealer repurchase agreements and the purchase options are considerably lower than the value of the equipment at the consummation of the leases. The depreciation of the rented property during the lease term, as reflected in the lower option prices, is certainly deductible by someone, and since we have determined petitioner to be a bona fide lessor, it is entitled to the deductions.[13]

The contract provisions employed by petitioner to dispose of the equipment at lease end, as stated previously, were only an attempt to minimize its business risks. This is also true of the other restrictive provisions in the rental agreements which tend to shift a substantial portion of the ownership risks to the lessee. Consequently, petitioner's efforts to impose certain ownership risks on the lessee do not raise a presumption of a sale instead of a lease, for such terms, being the subject of negotiation, are mere surplusage in determining whether in fact a lease was intended, and here that question has been resolved in the affirmative.[14]

*Decision will be entered under Rule 50.*

---

[13] We note with particular interest that in *Lockhart Leasing Co.,* 54 T.C. 301 (1970), respondent under similar circumstances did not contest the taxpayer's claimed depreciation deductions on the ground that such deductions were approximately equal to the return-of-capital factor petitioner would be able to deduct from the periodic payments in the event the transactions were sales.

[14] See *Glynn W. Keeling,* T.C. Memo. 1971–224; *San Diego Transit-Mixed Concrete Co.,* T.C. Memo. 1962–141.