*Decisions will be entered under Rule 50.*

PACIFIC SECURITY COMPANIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6714–70, 1212–72. Filed March 6, 1973.

*Leon C. Misterek* and *F. A. LeSourd,* for the petitioner.
*Eugene H. Flood,* for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in income taxes of petitioner as follows:

| FYE Nov. 30— | Deficiency |
|---|---|
| 1965 | $10,256.77 |
| 1966 | 38,103.87 |
| 1967 | 34,693.39 |
| 1968 | 51,657.04 |

Certain of the adjustments proposed by the respondent have been disposed of by agreement of the parties and the result of such agreement reflected in a stipulation of facts. Other adjustments have not been contested.[1] The only question remaining for decision is whether petitioner was a personal holding company as defined in section 542(a)[2] for the fiscal years ended November 30, 1965 to 1968, inclusive.

FINDINGS OF FACT

The parties have filed a stipulation of facts, which, together with accompanying exhibits, is incorporated herein by this reference.

Pacific Security Companies (hereinafter referred to as the petitioner) is a corporation organized on May 29, 1963, under the laws of the State of Washington. On November 30, 1971, the name of the corporation was changed to Pacific Security Companies. At all times material herein, Wayne E. Guthrie has owned 100 percent of the outstanding capital stock of the petitioner.

The petitioner kept its books and records and filed its Federal income tax returns on the basis of a fiscal year ending November 30. Returns for the fiscal years ending November 30, 1965 to 1968, inclusive, were filed with the district director of internal revenue, Tacoma, Wash., or with the Western Service Center of the Internal Revenue Service, Ogden, Utah.

At the time of filing the petitions herein, petitioner's place of business was North 2015 Monroe Street, Spokane, Wash. At the time of trial, its principal place of business was South 165 Howard Street, Spokane, Wash.

During the fiscal years involved in this proceeding, petitioner was engaged in the general financing business. It made loans, factored accounts receivable, discounted real estate contracts, discounted conditional sales contracts, and entered into chattel lease agreements. In

---

[1] For the fiscal year ended Nov. 30, 1968, the respondent determined that a loss of $7,732.63 on account of the sale of certain properties and the loss of $22,061.22 on account of a joint venture were excludable in the computation of personal holding company income. Petitioner failed to contest that determination. Since the respondent's determination is in full accord with the statute, the Court has assumed that there is no longer any dispute with respect to these losses.

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

addition, during its taxable period ended November 30, 1968, petitioner owned and rented certain real property from which it received gross rent in the amount of $30,167.43.

Petitioner did Lusiness in the States of Washington, Oregon, Idaho, and Montana, maintaining, in addition to its principal office in Spokane, Wash., offices in the cities of Seattle, Wash., Tacoma, Wash., Portland, Oreg., and Missoula, Mont. The petitioner derived its financing business principally from equipment dealers throughout the four States in which it did business. Representatives of the petitioner called on equipment dealers and maintained constant contact with them for the purpose of selling its financial services to them.

In its financing services to equipment dealers, the petitioner offered to provide financing on either a conditional sales program or a chattel-leasing program. Dealers were advised that if their customers wished to purchase equipment on a conditional sales contract, petitioner would purchase the equipment from the dealer and lease it to the customer.

The petitioner provided the dealers with which it did business with a "financing kit." The kit consisted of a plastic binder containing information about petitioner's financial services and a supply of the various forms necessary to put together a financing transaction. Included in the kit were conditional sales contract forms, chattel lease agreement forms, Uniform Commercial Code Financing Statement Forms, various credit application forms, informational brochures about petitioner's financial services, and a financing charge rate card.

The rate card was designed to enable equipment dealers to quote to their customers the monthly cost of leasing a given item of equipment or of purchasing it on a conditional sales contract. The card consisted of various rate factors to be multiplied times the equipment cost. The specific rate factor to be used depended upon the term of the lease or conditional sales contract, and upon the size of the transaction. The rate factors were designed to enable petitioner to recover over the term of the lease or conditional sales contract, its cost of the equipment or contract, plus a satisfactory financing charge.

The rate factors to be used for chattel leasing and for conditional sales contracts were the same. On a given piece of equipment the same rate factors would be used, whether the equipment was to be leased for a given number of months or purchased on a conditional sales contract requiring the same number of payments. The decision, whether a given item of equipment would be acquired through leasing or conditional sale financing, was made by the customer of the dealer with whom the petitioner did business.

A dealer's customer who decided to finance equipment, whether by leasing or conditional sale, would make out a credit application, con-

sisting of bank references, trade references, credit references, and financial statements. After evaluating the credit application, petitioner would either approve or reject the customer's credit. If the customer's credit was approved, petitioner would proceed to close the transaction, purchasing the conditional sales contract from the dealer in the event of a conditional sale, or purchasing the equipment from the dealer and signing a chattel lease agreement with the customer in the case of a lease.

The petitioner used preprinted chattel lease agreement forms. On each lease agreement was set out a description of the equipment, the name of the supplier of the equipment, the cost of the equipment, the amount of each payment, and the number of payments to be made. Included in the terms and conditions of the chattel lease agreement were the following:

(1) Petitioner retained title to the leased property.

(2) Petitioner reserved the right to inspect and label the leased property.

(3) Additions or improvements to the property became property of petitioner.

(4) The lessee was required to pay all taxes with respect to the leased property.

(5) The lessee assumed all risk of loss to the property and was required to maintain casualty and liability insurance with respect to it.

(6) The lessee granted a security interest in the leased property and all of the rights and remedies of a secured creditor under the Uniform Commercial Code to the petitioner.

(7) In the event of default by the lessee, petitioner reserved the right to: (a) Terminate the lease and repossess the property, or (b) declare all of the rent due and sue for it, realizing on the leased equipment for payment, with the lessee liable for any deficiency and the petitioner obligated to return any excess to the lessee.

(8) The lessee was obligated to return the leased equipment to petitioner at the end of the term.

(9) The petitioner disclaimed any liability for injury arising out of the use or condition of leased equipment.

Under the terms of the chattel lease agreement forms used by petitioner, the lessee had no right, obligation, or option to purchase the leased equipment at the end of the term. However, in addition to the durations of the chattel lease agreements as set out above, each lease agreement contained an option, giving the lessee a right to renew the lease agreement for various periods.

All of the chattel lease agreements entered into by petitioner covered equipment sold by equipment dealers in the ordinary course of their

business. Petitioner had no inventory of equipment held for lease and no wholesale connections for the purchase of equipment.

In its income tax returns for each of the fiscal years 1965 to 1968, inclusive, petitioner reported payments received from chattel lease agreements as gross rent, and claimed depreciation with respect to the leased property, based upon the terms of the respective leases. During the same period, the petitioner in most cases claimed the investment tax credit with respect to items of equipment covered by chattel lease agreements. In each year in issue, the petitioner in some cases exercised the option granted by section 48 (d) of the Internal Revenue Code and passed the investment credit through to the lessee of the equipment.

In the event that petitioner's adjusted gross income from the chattel lease agreements is deemed to constitute "rents" within the meaning of section 543 (a) (2), at least 60 percent of its adjusted ordinary gross income would constitute personal holding company income as defined in section 543 (a). Unless otherwise excluded under section 542 (c) (6), petitioner would meet the definition of a personal holding company as set forth in section 542 (a).

In the event that petitioner's ordinary gross income from the chattel lease agreements is deemed to have been derived from the active and regular conduct of a lending or financing business within the meaning of section 542 (c) (6) (A), more than 60 percent of petitioner's ordinary gross income as thus defined would be derived from the active and regular conduct of such business in each of the fiscal years involved in this proceeding. The petitioner would thereupon qualify for exclusion from the definition of a personal holding company as a "lending or finance company" within the meaning of section 542 (c) (6).[3]

OPINION

A personal holding company is defined generally in section 542 (a) as a corporation at least 60 percent of the adjusted gross income of which is personal holding company income, and which during the last half of the taxable year more than 50 percent in value of its stock is owned by or for not more than five individuals.[4] Petitioner's stock was owned by a single individual. If petitioner's adjusted gross income from the chattel lease agreements is deemed to be personal holding

---

[3] Since there is no dispute between the parties with respect to the underlying computations required under the statute other than the characterization of the income from chattel leasing, such computations have not been included in the Court's findings of fact.

[4] Sec. 542(a) provides, in part, as follows:

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if—

   (1) ADJUSTED ORDINARY GROSS INCOME REQUIREMENT.—At least 60 percent of its adjusted ordinary gross income (as defined in section 543(b)(2)) for the taxable year is personal holding company income (as defined in section 543(a)), and

   (2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * *

company income, it would also meet the income test. Thus, while various complex definitions and tests are embodied in the provisions with respect to the taxation of personal holding companies (secs. 541–547), the determination of the issue presented here turns on the characterization of petitioner's so-called leasing income.

In characterizing the leasing income as personal holding company income, the respondent relies on section 543(a)(2) which defines personal holding income to include "rents," except under certain conditions not present here. Section 543(b)(3) defines "rents" so as to include "compensation, however designated, for the use of, or right to use, property."

In contending that it is not taxable as a personal holding company, the petitioner relies on the exclusion provided in section 542(c)(6).[5] If the income from leasing constitutes a part of the income derived directly from the active and regular conduct of a lending or finance business, admittedly the petitioner would meet the requisite conditions of the exclusion.

In substance, the petitioner concedes that the term "rents" in section 543(a)(2) may be interpreted so as to include income which is received in the form of rent on the chattel leases before the Court. However, petitioner contends that such "rents" may nevertheless also be includable as income derived from the active and regular conduct of a lending or finance business under section 542(c)(6)(A).

In the petitioner's business, the prospective user of the equipment is given an option. The user may purchase the equipment under a conditional sales contract wherein the petitioner provides the funds in the form of a "loan" and is repaid in installments. In the alternative, after selecting the equipment to be purchased, the prospective user may enter into a contract to lease the equipment from the petitioner for a term of years. Petitioner thereupon issues its purchase order to the supplier of the equipment, and the lessee takes possession under the lease. In the chattel lease transaction, the "installments" are in the form of rent.

Petitioner argues that, as a practical matter, the net result is the same. Both transactions are regularly entered into as a part of the finance business. The income should, therefore, be treated the same.

From an economic standpoint, there may be no real distinction between the chattel mortgage form of financing and the chattel lease. In either case, the customer pays pro rata for the use of the equipment,

[5] Sec. 542(c)(6) provides, in part, as follows:

(c) EXCEPTIONS.—The term "personal holding company" as defined in subsection (a) does not include—

    \*      \*      \*      \*      \*      \*      \*

(6) a lending or finance company if—

    (A) 60 percent or more of its ordinary gross income (as defined in section 543(b)(1)) is derived directly from the active and regular conduct of a lending or finance business;

generally over the term of its anticipated service life. Irrespective of the form of financing, the customer is liable to pay the installments prescribed in the contract regardless whether the equipment functions properly, may be damaged through some casualty, or proves to be inoperable. In a majority of the leases, the customer may end up buying the equipment for its residual value.

We are not here concerned, however, with the economic similarities or dissimilarities of the "market place." In the provisions dealing with personal holding companies, the Congress has provided precise definitions and formulae. The "lending or finance business" is what Congress says it is.

As part of the statutory plan, section 542(d) prescribes the rules which must govern our decision. Section 542(d)(1) provides as follows:

(d) SPECIAL RULES FOR APPLYING SUBSECTION (c)(6).—

(1) LENDING OR FINANCE BUSINESS DEFINED.—

(A) IN GENERAL.—Except as provided in subparagraph (B), for purposes of subsection (c)(6), the term "lending or finance business" means a business of—

(i) making loans,

(ii) purchasing or discounting accounts receivable, notes, or installment obligations,

(iii) rendering services or making facilities available in connection with activities described in clauses (i) and (ii) carried on by the corporation rendering services or making facilities available, or

(iv) rendering services or making facilities available to another corporation which is engaged in the lending or finance business (within the meaning of this paragraph), if such services or facilities are related to the lending or finance business (within such meaning) of such other corporation and such other corporation and the corporation rendering services or making facilities available are members of the same affiliated group (as defined in section 1504).

(B) EXCEPTIONS.—For purposes of subparagraph (A), the term "lending or finance business" does not include the business of—

(i) making loans, or purchasing or discounting accounts receivable, notes, or installment obligations, if (at the time of the loan, purchase, or discount) the remaining maturity exceeds 60 months, unless the loans, notes, or installment obligations are evidenced or secured by contracts of conditional sale, chattel mortgages, or chattel lease agreements arising out of the sale of goods or services in the course of the borrower's or transferor's trade or business, or

(ii) making loans evidenced by, or purchasing, certificates of indebtedness issued in a series, under a trust indenture, and in registered form or with interest coupons attached.

For purposes of clause (i), the remaining maturity shall be treated as including any period for which there may be a renewal or extension under the terms of an option exercisable by the borrower.

It should thus be noted that in section 542(d)(1)(A) the statute refers to "making loans" and to "purchasing or discounting accounts

receivable, notes, or installment obligations." Section 542 (d) (1) (B) then excludes obligations where the remaining maturity exceeds 60 months, "unless the loans, notes, or installment obligations are evidenced or secured by contracts of conditional sale, chattel mortgages, or chattel lease agreements arising out of the sale of goods or services in the course of the borrower's or transferor's trade or business."

The term "chattel lease agreements" in the statute is not within the enumerated categories of direct transactions constituting permissible activities of the finance business, but is referred to only as the security for such transactions where the property subject to the lease was sold in the ordinary course of the borrower's or transferor's trade or business. The statute thus clearly contemplates a transaction whereby a third-party lessor obtains the funds to finance the transaction from the petitioner with the lease as security. If such financing is without recourse against the lessor, the net result insofar as the parties are concerned may be the same as if the lender had acted as lessor. However, the statute does not look to the net result. The statute carefully and specifically defines what is the lending or finance business. While there may be no difference in end result between a direct chattel lease and a nonrecourse loan secured by a chattel lease in the "market place," the statute clearly makes the distinction in delineating the activities which constitute the lending or finance business as defined in section 542 (d) (1).

Other tax incidents are dependent upon the same distinction. In considering whether taxpayers are entitled to the investment credit under section 38, this Court has upheld the distinction between chattel leasing and chattel financing. *Northwest Acceptance Corp.*, 58 T.C. 836 (1972); *Lockhart Leasing Co.*, 54 T.C. 301 (1970), affd. 446 F. 2d 269 (C.A. 10, 1971). Consistent with the cited decisions, this petitioner regarded itself as the owner and lessor of the equipment for purposes of the investment credit. In our opinion, no basis exists for applying a different rule merely because we are dealing with a different section of the Internal Revenue Code. Accordingly, petitioner fails to qualify as a lending or finance company excludable from the term "personal holding company" under section 542 (c) (6).

*Decisions will be entered under Rule 50.*