LYNN ADNEY and LINDA ADNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GARY M. COOPER and CAROL A. COOPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Adney v. Commissioner
Docket Nos. 16668-79, 16670-79.
United States Tax Court
T.C. Memo 1983-135; 1983 Tax Ct. Memo LEXIS 651; 45 T.C.M. (CCH) 971; T.C.M. (RIA) 83135; March 15, 1983. Gary M. Cooper, for the petitioners. Alan J. Pinner, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: This *652 case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure; the stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Many of the facts set forth herein are based upon examination of the exhibits and were not set out in the stipulation. Respondent determined a deficiency of $2,133 in petitioners Lynn and Linda Adney's income tax for the year 1974 in docket No. 16668-79. Respondent determined deficiencies of $1,551, $1,696, and $75 in petitioners Gary M. and Carol A. Cooper's income tax for the years 1971, 1972, and 1974, respectively, in docket No. 16670-79. The issue for determination in this consolidated case is whether petitioners, as shareholders in a Subchapter S corporation that was assignee-lessee to an equipment "lease," are entitled to a section 38[1] investment credit with respect to that equipment. FINDINGS OF FACT At the time of filing their petition herein, petitioners Lynn and Linda Adney were residents of Delano, California. *653 They were married during the year in issue and timely filed a joint Federal individual income tax return with the Internal Revenue Service Center in Fresno, California. At the time of filing their petition herein, petitioners Gary and Carol Cooper were residents of Encino, California. They were married during the years in issue and timely filed joint Federal individual income tax returns with the Internal Revenue Service Center in Fresno, California, for each of those years. Petitioners were shareholders of the Subchapter S corporation Almond Hullers Associated, Inc. (AH), which was incorporated on April 2, 1973. AH adopted a January 31 fiscal year, with its first fiscal year ending January 31, 1974. Two other shareholders of AH, S. P. Lipoma and Harry Roberts, were general partners in a partnership known as S.P. Lipoma Company (SP). Prior to the transactions here in issue, Harry Roberts received a letter from Raymond Bartlett, the regional manager of Crocker McAlister Equipment Leasing, Inc. (Crocker), dated April 3, 1973. The letter quoted two rental fee arrangements available to SP, both based on a 10-year rental period and both contemplating the lease by Crocker to *654 SP of an almond precleaning and hulling plant, consisting of concrete slab, steel building, machinery, and the appurtenant fixtures. The first rate quoted, $148.95 per $1,000 (of cost of the leased property) per year, provided for the investment tax credit to be retained by the lessor. The second rate quoted, $154.69 per $1,000 per year, provided for the investment tax credit to be passed through to the lessee. In the letter, Bartlett explained that his calculations showed the higher rate with the passed through credit to be the better option for the lessee. The rates were effective for 90 days, at which time Crocker's rate committee could either extend the rate or "increase it depending on the prime rate at that time." The letter also enclosed a copy of a form Equipment Lease Renewal Option and Extension Agreement, and Cancellation Terms, indicating that such form "can be exercised at the end of the lease term." On April 18, 1973, SP, as lessee, [2] entered into a 10-year lease with Crocker, for one Ripon Manufacturing Company Almond Pre-Cleaning and Hulling Plant. The lease as originally typed provided for an annual rental rate factor of 14.895 percent. This figure was marked *655 out on the lease and the figure 15.469 is typed in above the original number. This change is initialled by the parties to the lease. An asterisk appears next to the new figure, and the corresponding sentence beneath it provides "I.T.C. [investment tax credit] Passed on equipment when available to Lessor." The initial lease term was for 10 years commencing July 1, 1973. Monthly rentals of $4,420 were due through November 1973. Commencing December 1, 1973, nine annual rentals of $50,387 were due. A final rental payment of $25,911 was due December 1, 1982. The total rental due under this schedule was $501,494. The remainder of the lease, which was on a standardized printed lease form, provided, interalia, that: (1) Title to the equipment shall be with the lessor; (2) lessee shall pay for all taxes, licenses, maintenance, repairs, and liability and damage insurance; (3) lessee assumes the risk of loss, theft, or destruction of, and damage to the equipment; (4) lessee shall not assign its rights under the lease without prior written consent of the *656 lessor; (5) lessor may accelerate the lease rental payments upon failure by lessee to cure a default with 30 days of written notice by lessor of such default; (6) lessee could acquire the equipment directly, or from lessor, but if acquired directly, it shall be deemed sold to lessor and invoiced directly to lessor; and (7) at the termination of the lease, lessee shall return the equipment to the lessor in good condition, except for wear and tear, or shall pay to place the equipment in good condition. Crocker had the right to give a security interest in the equipment and to assign its rights under the agreement. A document executed June 20, 1973, entitled "Equipment Lease Enewal Option and Extension Agreement, and Cancellation Terms," allowed the lessee to continue the lease for two additional years at an annual rate of 2 percent of the total original equipment cost to Crocker. The June 20, 1973, agreement also provided that the lessee could cancel the lease during the last six months of the lease by, among other things, paying to the lessor any unpaid past or future rentals plus 5 percent of the original total equipment cost to the lessor. On July 24, 1973, SP entered into an *657 agreement with AH that assigned SP's lease rights under the agreement with Crocker to AH. No written confirmation of lessor's approval of assignment, as required under the lease, was provided by Crocker before January 23, 1978, although Crocker received notice of the assignment in July 1973 and began accepting lease rental payments from AH in July 1973. [3]
The plant was erected over the summer of 1973 on land acquired by AH from SP. [4] The price paid by Crocker to Ripon Manufacturing Company was $380,868.82, which, in addition to the basic equipment, included the cost of the fence, the grading and paving of the area surrounding the plant, shipping charges, and miscellaneous other charges. *658 In April 1974, Bartlett sent Roberts a letter in response to a request by Roberts for the written election necessary to pass through the investment credit under section 48(d), reporting that Crocker's records showed the equipment lease as an investment credit-retained transaction. On July 12, 1974, however, Bartlett circulated an inter-office memorandum to several people at Crocker, repeating Roberts' requests for the election, explaining that the face of the lease and the rental rate utilized reflected an intention to pass the credit through to the lessee, and asking Crocker management "what we are going to do about living up to our commitments." In May 1975, SP asked Crocker to quote the price at which the lease could be canceled and ownership of the equipment vested in SP. By a letter dated May 22, 1975, Crocker informed SP that the equipment subject to the lease could be purchased for $434,644.15. This amount was computed by Crocker as net book value, plus sales tax, plus personal property tax. "Net book value," as defined by Crocker, equaled gross total remaining lease receivables plus 5 percent of the equipment's acquisition costs, plus any investment tax credit recapture *659 required of Crocker (because Crocker had claimed the investment tax credit), less a discount factor reflecting the early payoff of the lease schedule. The equipment was not purchased. On January 27, 1978, petitioner Gary M. Cooper wrote to Crocker again asking the cost of cancelling the lease and acquiring title to the leased property. The response from Crocker, set forth in a letter dated February 3, 1978, was that the cost would be $282,561.71, which included applicable sales and personal property taxes. This amount was computed using the same formula utilized in May 1975. On its U.S. Small Business Corporation Income Tax Return for the taxable year ending January 31, 1974, AH took a rental deduction for the leased facility, claimed it as property eligible for the investment credit, and reported each shareholder's pro rata allocation of the credit. The Adneys reported and utilized their share of the investment credit, $2,146, on their 1974 return; all except $13 was disallowed by respondent. [5] The Coopers reported $4,331.88 of investment credits on a schedule attached to the 1974 return, but filed a Form 1045, Aplication for Tentative Refund from Carryback of Net Operating *660 Loss on Unused Investment Credit, which applied $2,165.94 in tax credits to each of the 1971 and 1972 tax years. Of the $4,331.88 claimed by the Coopers, respondent disallowed the $3,247 attributable to the almond hulling facility and applied by the Coopers to 1971 and 1972. The pertinent part of the statutory notices sent to petitioners Adney and Cooper explained the readjustments as follows: (1) [N]o election under Section 48(d) of the Internal Revenue Code was made by the lessor of the property, Crocker McAlister Equipment Leasing Company, to pass the credit on to Almond Hullers Associated, Incorporated, a small business corporation of which you were * * * [a] stockholder or, alternatively, (2) it has not been established that the transaction was a disguised purchase. * * * [6]
The deficiency of $75 for 1974 determined by respondent has been conceded by the Coopers and is not in issue here.Respondent has agreed that the amounts claimed as credits by petitioners are correct should the Court find for petitioners. *661 ULTIMATE FINDINGS OF FACT. 1. Crocker and SP intended to enter an agreement that would provide SP with the benefit of the investment credit; [7] and 2. AH acquired an equity interest in the equipment which was the subject of the agreement.
OPINION Petitioners claim that as shareholders of AH, a Subchapter S corporation, they are entitled to a portion of the investment credit available under section 38 with respect to the almond hulling facility. In general, section 38, as amplified by section 48(a)(1), authorizes a credit *662 against tax for investment in tangible personal property as to which depreciation is allowable if it had a useful life of three years or more. In order to obtain the credit for new property, the original use of such property must commence with the taxpayer. Section 48(b)(2).Where leased property is concerned, the lessor is considered the first user of the property, Haddock v. Commissioner,73 T.C. 511 (1978), but section 48(d) permits a lessor to elect, with respect to new property, to pass the credit through to the lessee rather than claim it himself. Petitioners have conceded that no election under section 48(d) was filed by Crocker. Thus, in order to prevail, they must show that the corporation had an equity interest in the property, i.e., that the "lease" was in substance a sale. The characterization of a transaction for Federal tax purposes is controlled by the substantive provisions of the agreement and the parties' conduct, rather than by the particular terminology used in the agreement. Frank Lyon Co. v. United States,435 U.S. 561 (1978). *663 Petitioners do not deny that the transaction giving rise to this controversy was structured by the parties entering into it as a lease, or that they became assignees to the lease without knowledge of the form of the transaction. Nor do they deny that AH took a rental deduction on its 1973 return for the use of the equipment, and not depreciation and interest deductions, which would ordinarily follow a sale. Finally, the investment credit obviously was reported by AH on its 1973 return because AH's corporate officers believed the credit had been passed through by election, and not because they believed the corporation to be the owner of the equipment. Nonetheless, petitioners contend the substance of the transaction was a sale, and as shareholders of the Subchapter S corporation that acquired the equity interest in the equipment they are entitled to the investment credits as claimed on their returns. Respondent argues that the transaction entered into by Crocker and SP was a lease in substance as well as form, relying primarily upon Lockhart Leasing Co. v. Commissioner,54 T.C. 301 (1970), affd. 446 F.2d 269 (10th Cir. 1971), and Northwest Acceptance Corp. v. Commissioner,58 T.C. 836 (1972), *664 affd. per curiam 500 F.2d 1222 (9th Cir. 1974). Respondent correctly notes that the determination of the true nature of the transaction, as in all lease versus sale cases, requires an examination of the particular facts and circumstances of the individual case. See Northwest Acceptance Corp. v. Commissioner,supra at 845. Both parties in this case have agreed that the principles enunciated in Lockhart Leasing Co. v. United States,supra, are applicable to the ultimate decision that must be made here. A close examination of the facts and opinion in Lockhart Leasing Co. v. United States,supra, is thus warranted. The petitioner in the Lockhart Leasing Co. case was a corporation engaged in the business of acquiring machine tools, store, business, and office equipment, and similar items as requested by its customers, and then placing the item in the customer's possession and use under a form called an Equipment Lease Agreement. The respondent determined that the transactions in reality constituted sales and denied the corporation the *665 investment tax credits. The Tax Court, after examining the facts and circumstances, found that the various agreements were, on the whole, lease agreements. In affirming the Tax Court decision and an unreported companion case from the District Court for the District of Utah ( D. Utah 1969, 24 AFTR 2d 69-5794, 69-2 USTC par. 9705), the Tenth Circuit framed the issue as "whether the taxpayer had a depreciable interest in the property which was the subject of its agreements with its customers." Lockhart Leasing Co. v. United States,supra, at 271. The various findings of the two trial courts added together led the Court to the conclusion that the lessor in that case did indeed have depreciable interests in the equipment; therefore, the transactions were rentals not sales. Petitioners in the instant case agree with the legal reasoning used and the conclusion reached in Lockhart Leasing Co. v. United States,supra, but contend that the facts supporting the conclusion in the Lockhart Leasing Co. case are not present herein. We agree. The trial courts found that in a number of instances the taxpayer [lessor] was required to retake possession of the *666 equipment as provided in the agreement before the end of the term and to make some disposition of it, and was also required on occasion to dispose of equipment at the end of the term. The record shows that the parties to each agreement negotiated the provisions with a view to the worth of the equipment at the end of the term. The record does not show that the total amount paid by the customer during the term was disproportionate to the value of the equipment for such period. The record shows that where the agreement contained an option to buy in the customer, it was an amount based upon the expected value of the property at the time the option could be exercised. * * * * * * The Tax Court found that the rental payments and the option provisions or negotiated options all had a reasonable relationship to the value of the property during the term of the agreement or at the option date. * * * The Tax Cort also found that the taxpayer was not here engaged in financing the purchases and this is also supported by the facts. * * * * * * [The United States District Court] found that the rentals were based on the cost of the equipment, how long it was to be used, and what the value *667 was expected to be at the end of the agreement. The court also found that when an option price was stated it was based on the fair market value of the equipment at the end of the lease. The trial court thus concluded that the property subject to the agreements was a qualified investment under section 38(a) of the 1954 Code to allow taxpayer the investment credit. * * * Further * * * the record demonstrates that the rentals were related to standard rates and did not represent a recovery of the purchase price plus interest. * * * Lockhart Leasing Co. v. United States,supra at 270-272. As petitioners assert, the facts that demonstrated bona fide lease agreements to the Tenth Circuit are not present here. Indeed, the salient factors relied upon by the Tenth Circuit are refuted by the evidence in this case. For example, here the burden of placing possession of the property back in the hands of the lessor was on the lessee not the lessor. The property was permanently erected on land owned by AH, and AH was obligated to pay all the rental contemplated by the agreement even if AH chose to end the lease prematurely. Because AH would have more than paid for the equipment *668 affixed to its real estate, would still be able to use it, and could acquire title at the end of the lease for a nominal amount, it is unlikely AH would fail to pay Crocker the amount necessary to obtain title. Similarly, because Crocker would be repaid its cost of the equipment, plus its carrying costs and a profit (the sum of the rentals), it is unrealistic to believe that Crocker would be interested in recovering the equipment. This situation is more analogous to the situation in Starr's Estate v. Commissioner,274 F.2d 294 (9th Cir. 1959), revg. on other grounds 30 T.C. 856 (1958), in which a sprinkler system was "leased" and installed in the taxpayer's plant. The Ninth Circuit, in affirming the Tax Court's determination that the transaction was really a sale, found that there was little probability that the lessor would come after paid-for equipment installed in the lessee's building. The Court also relied on the fact that the rental payments would produce for the lessor the equivalent of his normal sales price plus interest, and the fact that the value to the lessor in the property had been exhausted. Here, too, the value of the property to *669 Crocker is exhausted upon the termination of the lease because cost and profit have been recovered and the equipment cannot feasibly be moved. The record here does not show that the provisions of the agreement were negotiated with a view to the worth of the equipment at the end of the term. Rather, the evidence indicates that the provisions of the agreement were negotiated with a view towards the sum of the cost to Crocker of the equipment, of the yield potential of the funds invested in the equipment, and profit. Another factor specified by the Court in the Lockhart Leasing Co. case, whether or not the total rental paid during the lease term is disproportionate to the value of the equipment over the term, also supports the conclusion that the transaction here was a sale. The leased property consisted primarily of a steel building and machinery and cost Crocker $380,868.82. The total rental contemplated by the lease over the 10-year term was $501,494. The equipment would be usable and valuable well beyond 10 years, but this transaction provided for the lessor to recover its cost plus profit before the expiration of the lease term. Although the original lease agreement *670 did not expressly include an option to purchase the equipment, Crocker's letters of April 3, 1973, May 22, 1975, and February 3, 1978, support petitioners' contention that the June 30, 1973, agreement was intended by Crocker and AH to provide an option to buy the equipment. The "option price" is not based on the value of the property at the time of exercise, however; it is based upon the remaining lease receivables, plus a percentage of the equipment's cost and the recaptured investment credit, less a discount for the early payoff. Again, the evidence supports petitioners' argument that the transaction was in reality a sale, for the option price appears to reflect the cost of an early payoff of a deferred purchase arrangement, and not the value of the equipment at the end of the lease. We cannot determine from the evidence presented whether Crocker was, in general, engaged in financing equipment purchases, but on the facts of this particular case it seems apparent that Crocker was financing this particular purchase and installation, especially in light of the lease provision permitting the lessee to acquire the property directly but requiring the invoice to be sent to Crocker. *671 Respondent finds significant the fact that, under the agreement, title to the equipment was to remain with Crocker. This argument is not persuasive to us or to the Ninth Circuit. See Starr's Estate v. Commissioner,supra.See also Swift Dodge v. Commissioner,692 F.2d 651 (9th Cir. 1982), revg. 76 T.C. 547 (1981). In the latter case, both this Court and the Court of Appeals determined the substance of the transaction by analyzing many aspects of the transaction, only one of which was which party held legal title. Thus, the fact that the agreement here does not contemplate passage of title to the lessee does not negate petitioners' position. In addition to Lockhart Leasing Co. v. United States,supra, respondent relies upon Northwest Acceptance Corp. v. Commissioner,supra.In the Northwest Acceptance Corp. case the taxpayer acquired or entered equipment leases similar to the lease herein, except that purchase options were there expressly included.In addition, the rentals in the Northwest Acceptance Corp. case were based on a percentage (determined by the length of the lease) of the equipment's *672 cost, less an estimated residual value. Although the option rates were generous, this Court did not find that the terms of the agreements would force the lessee into the position of having to exercise its option to make the lease economically favorable. In addition, we found that "the options did not remove all risks of depreciation from the petitioner [lessor], for the lessees were in no way bound to exercise the option and, in the event the equipment was worth less than the option price at the option date * * * they clearly were free to decline their right." Northwest Acceptance Corp. v. Commissioner,supra at 848. Thus, in the Northwest Acceptance Corp. case the equipment was not fully paid for at the end of the lease, the lessor could retrieve the property, and would bear the risk of depreciation on the equipment. This is not true where the lease terms guarantee complete recovery of cost plus profit to the lessor. Here, the lessee is in the position of having to exercise its option to purchase in order to make the lease worthwhile. "[W]here the foreordained *673 practical effect of the rent is to produce title eventually, the rental agreement can be treated as a sale." Starr's Estate v. Commissioner,supra at 295. Because we find that the lease transaction was essentially a sale, and petitioners' Subchapter S corporation acquired an equity interest in the leased property sufficient to entitle them to the investment credit, Decision will be entered for the petitioners in docket No. 16668-79.
Decision will be entered for the petitioners in docket No. 16670-79 as to the years 1971 and 1972, and for the respondent as to the year 1974.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. The terms "lease," "lessee," and "lessor" are used herein for convenience and do not imply any legal conclusions.↩
3. The statutory notices of deficiency issued by respondent do not deny the credit taken by petitioners on the ground that AH was not a valid assignee to the lease. An issue regarding the assignment was raised for the first time on brief; it requires different proof, and is not properly before us. Aero Rental v. Commissioner,64 T.C. 331 (1975); Nash v. Commissioner,31 T.C. 569↩ (1958).
4. Thus we find dubious various references in the contractual documents to "return of the equipment" at the end of the lease term. See p. 13, infra.↩
5. The credit allowed by respondent was attributable to used sec. 38↩ property owned by AH in addition to the property that is the subject of this dispute. 6. The quoted language from the notices sent to the Adneys and the Coopers were essentially identical except that "bona fide" was substituted for "disguised" in the Coopers' notice.↩
7. This finding is relevant because we would not be willing to allow a taxpayer to avoid the form of the transaction to secure a benefit that he had contractually foregone. We would have preferred to make this finding with the assistance of evidence from Crocker as to its version of the transaction, but respondent presumably had the ability to produce such evidence and failed to do so. We do not determine whether the failure of petitioners to secure the election was due to their negligence or to inadvertence or deliberate conduct on the part of Crocker.↩