THE LTV CORPORATION,[1] PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4080-71.    Filed October 21, 1974.

*Neil J. O'Brien* and *Jimmy L. Heisz,* for the petitioner.
*John W. Dierker,* for the respondent.

STERRETT, *Judge:* The respondent determined deficiencies in petitioner's Federal income tax for the calendar years 1962, 1963, and 1964 as follows:

| Year | Deficiency |
|------|-----------|
| 1962 | $49,371.79 |
| 1963 | 2,042,488.96 |
| 1964 | 1,769,443.38 |

[1] By motion of the petitioner, to which the respondent had no objection, the pleadings were amended to reflect the name change of Ling-Temco-Vought, Inc. to The LTV Corporation.

Of the many issues raised by respondent during his audit of petitioner's tax returns all but three had been settled by the trial date. An additional issue has since been conceded by the respondent in its entirety, leaving two issues to be decided by the Court.

The first issue relates to the applicability of the investment credit provided for by section 38, I.R.C. 1954,[2] to one International Business Machines Corp. 7090 Data Processing System installed in petitioner's computer center facilities at Arlington, Tex. The second issue requires us to determine whether the transaction by which petitioner acquired the above data processing system is to be characterized for tax purposes as a lease entitling petitioner to a deduction under section 162(a)(3) for rent paid, or as a conditional sale requiring petitioner to capitalize the cost of the data processing system and deduct appropriate amounts for depreciation and interest under sections 167 and 163, respectively.

### FINDINGS OF FACT

Some of the facts are stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated by this reference.

The LTV Corp. (hereinafter petitioner) was incorporated under the laws of the State of Delaware on November 20, 1958. Since incorporation petitioner's name has been changed several times, the last one occurring May 5, 1972. Petitioner's principal office is located in Dallas, Tex. For the years 1962, 1963, and 1964 petitioner filed consolidated Federal income tax returns with the District Director of Internal Revenue in Dallas, Tex.

Prior to July 1960 petitioner was engaged principally in the business of developing and producing electronic products and electro-mechanical, acoustical, air conditioning, and refrigeration equipment. With the acquisitions of Temco Aircraft Corp. in July 1960 and Chance Vought Corp. in August 1961 petitioner directly or through one or more subsidiaries, became engaged in the design, development, and production of missiles, military aircraft, military aircraft assemblies, and electronic and other components thereof.

---

[2] All Code references are to the Internal Revenue Code of 1954 as amended.

This venture into the *production of military equipment necessarily involved petitioner in many Government contracts. On certain types of contracts petitioner would be entitled to recover its costs. To recover these costs petitioner submitted invoices and public vouchers to Government auditors for review as provided in the contractual agreement. In addition to the direct charges, overhead costs were submitted and received and charged to overhead pools, which were allocated to specific contracts.

On October 23, 1961, petitioner entered into an agreement entitled "Equipment Lease Agreement" (hereinafter Boothe lease) with Boothe Leasing Corp. (hereinafter Boothe) to lease one International Business Machines Corp. 7090 Data Processing System (hereinafter computer).[3] Relevant provisions of the Boothe lease include the following terms:

1. The lease of and rent for the computer was to commence on the day specified in the equipment lease schedule.

2. As additional rental, lessee was to pay all license fees, assessments, or taxes imposed by any governmental authority upon the computer, whether such license fees or taxes were billed to the lessor or lessee.

3. Lessee at its sole expense was required to maintain at all times during the term of the agreement the computer in good operating order and repair.

4. Lessor assigned to lessee for the term of the agreement any applicable factory warranty, express or implied, issued on or applicable to the leased property, and authorized the lessee to obtain the customary service furnished by the manufacturer at lessee's expense.

5. Lessee was to maintain, at its own expense, insurance on the leased property for its actual value, but in no event for less than the stipulated loss value specified in the equipment lease schedule, naming the lessor and lessee as the insureds.

6. Lessee assumed all risks of loss, theft, or destruction of, and damage to the leased property.

---

[3] The terms "lease," "lessee," "lessor," and "rent," as used in the findings of fact, are not intended to indicate the character of the transactions in question, but instead are used solely for purposes of clarity and convenience.

7. Nothing contained in the lease was to give or convey to lessee any right, title, or interest in any of the leased property except as a lessee.

The equipment lease schedule (hereinafter schedule) referred to in the Boothe lease established additional relevant provisions of the agreement. The term of the lease was to be 60 months commencing January 23, 1962, with a renewal option of indefinite duration, and no deposit was required. The rental payment schedule was included and called for semiannual payments as follows:

| | | |
|---|---|---|
| 1st year: | two payments of_____ | $535,768.08 |
| 2d year: | two payments of_____ | 535,768.08 |
| 3d year: | one payment of _____ | 535,768.08 |
| | one payment of _____ | 133,942.02 |
| 4th year: | two payments of_____ | 133,942.02 |
| 5th year: | two payments of_____ | 133,942.02 |

If petitioner took up the renewal option, annual payments of $116,471.32 would be due.

The stipulated loss value schedule was also included and showed the minimum value for the computer to decrease from its original cost of $2,911,783 to its estimated market value at the end of the 5-year lease term of $291,178.30. The relationship of the stipulated loss value to the remaining rent due and the estimated market value of the computer after 5 years is as follows:

| | Remaining rent due | + | Estimated market value after 5 years | = | Total | Stipulated loss value |
|---|---|---|---|---|---|---|
| Year 1_____ | $3,348,550 | | $291,178 | | $3,639,728 | $2,911,783 (original cost) |
| Year 2_____ | 2,277,014 | | 291,178 | | 2,568,192 | 2,277,014 |
| Year 3_____ | 1,205,478 | | 291,178 | | 1,496,656 | 1,351,067 |
| Year 4_____ | 535,768 | | 291,178 | | 826,946 | 826,946 |
| Year 5_____ | 267,884 | | 291,178 | | 559,062 | 704,651 |

Attached to the schedule is a description of the computer. It shows that the computer is to consist of 24 separate components.

As an addition to the Boothe lease, Boothe granted to the petitioner the option to purchase the computer at the expiration of the lease term. The purchase price was set at 10 per cent of the original cost which amounts to $291,178.30. These terms were set out in a letter dated January 23, 1962, from Boothe to petitioner. The price was quoted to Boothe by the International

Business Machines Corp. (hereinafter IBM) as the amount for which they would sell the computer at that time.

To fulfill its requirements to petitioner, Boothe entered into an agreement of sale with IBM to purchase the computer. Pursuant to this agreement, the computer was to be installed and placed in good working order on petitioner's premises by IBM. Relevant provisions of the agreement may be summarized as follows:

1. Terms: Invoice rendered at time of shipment. Payment to be made in full upon the later of the date of installation or 30 days after the date of invoice.

2. Title: Title to each machine was to remain vested in IBM until the full purchase price was paid. IBM assumed the risk of loss or damage to the machine up to the time it was installed, except for loss or damage resulting from negligence of the purchaser.

3. Installation: Machines purchased under the agreement were to be installed and placed in good working order by IBM without additional charge. The date on which IBM notified the purchaser in writing that a machine had been placed in good working order and was ready for use was to be considered the date of installation of such machine for all purposes of the agreement.

4. Warranty: IBM was required to keep the machines in good working order for 90 days from date of installation.

The computer was shipped on December 13, 1961, from Poughkeepsie, N.Y., for delivery to petitioner's computer center at Arlington, Tex. Upon delivery, a few days later, the installation work was commenced by IBM personnel. The work was performed by a crew of five to eight people. Of this group three to four were assigned specially for the installation work, the remainder were assigned to service and maintain the computer on a permanent basis. The specially assigned group did not leave petitioner's computer facilities until the middle of January 1962. However, despite the notification of installation requirement in the agreement of sale, no such notice was sent by IBM to either petitioner or Boothe, nor was any notice of acceptance of the computer sent by petitioner to IBM.

Boothe did not accept or pay for the computer until it was assured by IBM that it was completely installed and in good

working order. These requirements were satisfied between January 17, 1962, and January 23, 1962. Pursuant to Boothe's policy to place the computer on a rental basis immediately following installation, the lease term commenced January 23, 1962. Boothe paid for the computer by check on January 29, 1962.

The use of the computer was essential to petitioner's operations, especially its Government contract work. It was also important that the petitioner have the latest equipment to successfully compete in the bidding for Government contracts. Petitioner anticipated complete use of the computer, since it could be used for scientific and financial operations, and petitioner's acquisition of the computer was based on this anticipation.

After analyzing the expected use of the computer, petitioner decided that it would be cheaper to deal with Boothe rather than IBM. The Boothe lease required petitioner to pay a fixed rental whereas IBM's rental was based on usage. IBM's basic rental was for an 8-hour shift, with additional rent due for additional use. Since petitioner expected a utilization rate beyond the break-even point, Boothe's terms were pursued.

On petitioner's consolidated income tax return for 1962, the cost of the leased computer was claimed as an investment in property eligible for the investment credit provided for in section 38. An appropriate election was filed with petitioner's 1962 consolidated income tax return to treat petitioner, the lessee, as the purchaser of the property pursuant to section 48(d) as it then existed. Respondent in his deficiency notice disallowed this claim as follows:

> It is determined that claimed 1962 investment credit of $208,825 applicable to the $2,911,783 cost of an IBM 7090 Computer System is disallowed because the property was acquired and placed in service before 1962.

Respondent does not now contest the validity of the election treating petitioner as the purchaser of the property, nor that the computer is property eligible for the investment credit.

On its financial statements, petitioner accounted for the acquisition of the computer as a lease deducting the payments to Boothe as rental. These payments were allowed by the Government auditors as proper expenses with respect to the Government contracts. For tax purposes, petitioner also treated the acquisition

as a lease deducting the payments as rental. Respondent in his deficiency notice disallowed this treatment as follows:

It is determined that the contractual acquisition in 1961 of an IBM 7090 computer under an alleged lease arrangement was in substance and in fact a conditional purchase of depreciable property; that claimed deductions for rental expense are disallowed; * * *

Accordingly, respondent recast the transaction by disallowing the claimed rental expense and allowing appropriate amounts for depreciation and interest. Petitioner does not now contest the figures that respondent used if his legal position is sustained by this Court.

OPINION

This case involves two questions that have arisen from the petitioner's acquisition of the computer. The first issue is whether the petitioner is entitled to the investment credit provided for in section 38 resulting from the acquisition of the computer. The second issue is whether the transaction by which petitioner acquired the computer should be characterized for tax purposes as a lease, allowing petitioner to deduct the payments to Boothe as rental under section 162(a)(3), or as a conditional sale, requiring petitioner to capitalize the cost of the computer and deduct appropriate amounts for depreciation and interest under sections 167 and 163, respectively.

*Issue 1. Investment Credit*

Due to concessions by the respondent this issue is a narrow one and turns upon whether the computer constitutes "new section 38 property" within the meaning of the following provisions of section 48(b):

(b) NEW SECTION 38 PROPERTY.—For purposes of this subpart, the term "new section 38 property" means section 38 property—
(1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or
(2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date.
In applying section 46(c)(1)(A) in the case of property described in paragraph (1), there shall be taken into account only that portion of the basis which is properly attributable to construction, reconstruction, or erection after December 31, 1961.

In October 1961 petitioner entered into a lease with Boothe, the relevant terms of which have been summarized in the findings of fact. To fulfill this agreement, Boothe made an agreement with IBM to purchase the computer. The relevant provisions of this agreement have also been set out in the findings of fact. Pursuant to this agreement, the computer was to be installed and placed in good working order on petitioner's premises by IBM. The computer was delivered and the installation work began in the middle of December 1961. The installation requirements were not satisfied until the third week of January 1962 when the lease commenced and Boothe paid for the computer.

Respondent argues that the computer does not qualify as "new section 38 property" since it was acquired before December 31, 1961. He cites sec. 1.48-2(b)(6), Income Tax Regs., which provides that "Property shall be deemed to be acquired when reduced to physical possession, or control," and asks us to give these words their "everyday straight forward English meaning." In *Madison Newspapers, Inc.,* 47 T.C. 630, 635 (1967), we said the following with respect to this language in respondent's regulations:

> This regulation, however, is directed for the most part, as is respondent's argument herein, on the *when* of possession or control and fails to deal with the nature of the property subject to these powers. Undoubtedly petitioner herein did have "possession or control" of something on or before December 31, 1961, but the critical question requiring resolution is possession or control of *what.*

We hold that the *what* in this case is an installed and operating computer; one that is available for use by the petitioner for the purpose for which it was purchased. We believe this to be the property with respect to which "physical possession or control" should be determined. Such an interpretation accords the words a commonsense meaning.

Respondent disagrees with our holding in *Madison Newspapers, Inc.* but also seeks to distinguish it on the grounds that we placed great weight on the taxpayer's rights to installation service, and in this case IBM's installation obligation was to Boothe and not petitioner. However, pursuant to the agreement between Boothe and IBM, the computer was to be installed and placed in good working order on petitioner's premises by IBM. The Boothe lease made it clear that Boothe was not the manufacturer of the computer, and that Boothe

authorized petitioner to obtain the customary service furnished by IBM. Neither Boothe nor the petitioner had the necessary expertise to install this highly complex piece of equipment, nor was it likely that anyone other than IBM could properly install the computer. Consequently we believe that it was the clear understanding of all the parties involved that IBM's installation obligation—to install and place the computer in good working order without additional charge—would accrue to petitioner's benefit. In so doing, we find *J. E. Barron Plastics, Inc. v. Commissioner,* 397 F. 2d 250 (C.A. 6, 1968), affirming 47 T.C. 638 (1967), to be distinguishable.

Having established the "what" of section 38 property, we now must analyze the facts as presented to determine when it was installed. There is no question that the computer arrived and the installation work began in the middle of December 1961. However, from that point on the record becomes unclear.

Respondent relies heavily on the testimony of George Nanson, an IBM field engineer, who was responsible for the installation of the system. Nanson indicated the work was well along by Christmas, but he could not recall when the job was completed. Nanson did indicate that the entire job took about 9 to 10 days which would mean a completion date before yearend.

However, IBM's procedures indicate that the field engineer does not inform the customer of his progress. He makes progress reports to the IBM marketing representative who is responsible for determining for IBM when a machine is installed. This determination is based on negotiations with the customer. Gene E. Washington served as the marketing representative for IBM for this account. Washington testified that he was in daily contact with petitioner and that he considered the computer to be installed by the middle of January. Washington also accounted for the lack of the written notice of installation. Since he was in daily contact with the customer the formal written notice became superfluous.

This testimony is in line with the January 23, 1962, commencement of the Boothe lease, and the January 29, 1962, payment by Boothe for the computer. Under the terms of the agreement of sale, if the computer had been installed by yearend the purchase price would have been due by January 13, 1962. If Boothe had paid for the computer at that time, the Boothe lease would have started the next day. Since we believe neither Boothe

nor IBM to be charitable institutions, we find the timing of the above events to be strong evidence that the computer was not installed until January 1962. Furthermore, Washington's estimation also agrees with the final departure of the IBM installation crew in the middle of January 1962.

This finding also tends to discredit respondent's reliance on an internal IBM document (hereinafter I.A.C.). The I.A.C. records for IBM the installation, alteration, or cancellation of service. The I.A.C. shows that the various components of the computer were installed on December 28, 1961. Glen M. Countryman, a current IBM employee, testified with respect to the document's authenticity; however he was not personally involved with the installation of the computer. His testimony merely related to his interpretation of the I.A.C.

Paul W. Williams, Jr., also testified with respect to the I.A.C. He was the IBM branch manager in 1961 and the individual responsible for the I.A.C. Williams testified that the date on the I.A.C. could have been completed by one of his staff.[4] He also indicated that the installation date on the I.A.C. would trigger the crediting of the salesman's commission and quota points, both important figures for a salesman to have before yearend. Consequently the salesman's view of installation could be decidedly different from that of the other people involved. Williams also doubted Nanson's testimony that the computer was installed in 9 to 10 days. For a machine of this size, he would have been happy if the installation had been completed in 3 weeks.

IBM felt its installation obligation was not completed until there was a mutual agreement between IBM and the customer that the machine was operational and ready to perform the functions for which it was intended. We also believe that this is a proper standard to guide us in the resolution of this difficult question. After a careful consideration of this record, we find this final step did not occur until well into January 1962. Consequently, we hold that the computer qualifies as "new section 38 property" since it was acquired after December 31,

---

[4] Petitioner strenuously objects to the introduction of this document. Although Williams' signature is on the I.A.C., he did not sign it. The I.A.C. was prepared Oct. 30, 1961, and the signature is dated Dec. 8, 1961, both of which are before the shipment date. There is no indication, however, that the document had been deliberately falsified, and it is obviously part of IBM's business records and was so identified.

1961, within the meaning of section 48(b).[5] The record also includes additional testimony describing the condition and appearance of the installation area at yearend. Based upon the above finding, we believe that discussion of this testimony would be of little value.

## *Issue 2. Sale or Lease*

Due to concessions by the petitioner our task is solely to characterize the form of the transaction by which petitioner acquired the computer. Petitioner argues that under the factual pattern of this case and those of *Lockhart Leasing Co.,* 54 T.C. 301 (1970), affd. 446 F. 2d 269 (C.A. 10, 1971), and *Northwest Acceptance Corp.,* 58 T.C. 836 (1972), affd. 500 F. 2d 1222 (C.A. 9, 1974), this transaction too should be characterized as lease. As such petitioner claims it is entitled to deduct the payments to Boothe as rental under section 162(a)(3).[6] Respondent's position is that the factual pattern presented indicates that the substance of the transaction is a conditional sale. Accordingly, respondent disallowed the rental deduction and required petitioner to capitalize the purchase price and allowed appropriate deductions for depreciation and interest under sections 167 and 163, respectively. We agree with the petitioner.

There have been numerous cases which have considered whether an agreement which was in form a lease was in substance a sale for tax purposes. In making this determination we have been concerned with the economic substance of the transaction and not the form in which it was cast. This procedure is continued in the case at bar.

To support his position, respondent makes a fourfold argument. His first argument cites the terms of the Boothe lease which placed the burdens of ownership on the petitioner. The Boothe lease did require petitioner, at its own expense, to repair, insure,

---

[5] There is no indication of, nor does respondent allege deliberate delay in the installation of the computer. See *Madison Newspapers, Inc.,* 47 T.C. 630, 637 (1967), which indicates that as of January 1962 such delay would have been unnecessary.

[6] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

and pay all taxes arising out of ownership. However, in this respect the leases as described in *Lockhart Leasing Co., supra* at 302-306, and *Northwest Acceptance Corp., supra* at 838-839, which gave rise to valid leasing arrangements, are strikingly similar.

Respondent argues that Boothe protected itself from risk of loss by requiring petitioner to insure the computer for an amount at least equal to the outstanding rent plus the amount necessary to exercise the option. As detailed in the findings of fact it is not until the fourth year of the lease term that Boothe is so protected. In addition, the Boothe lease itself made a specific provision that no title passed to the petitioner, and there is no indication in the record that IBM would buy back the computer from Boothe if petitioner defaulted.

Respondent's second argument is that the existence of an option to purchase the property at the end of the lease term indicates a conditional sale. Respondent has cited cases in which the option price was either nominal or when added to the other payments approximated the original selling price of the property. See *D. M. Haggard,* 24 T.C. 1124 (1955), affd. 241 F. 2d 288 (C.A. 9, 1956); *Quartzite Stone Co.,* 30 T.C. 511 (1958), affirmed on other grounds 273 F. 2d 738 (C.A. 10, 1959); *Judson Mills,* 11 T.C. 25 (1948). In this case the option price, 10 percent of the original purchase price—$291,178.30, was established after Boothe learned from IBM that this was the price for which IBM would sell the computer after 5 years. Furthermore, the option agreement does not allow any part of the payments by petitioner to Boothe to offset this price. On these facts we find the option price to be comparable with the computer's estimated fair market value at the end of the lease term. Consequently, the existence of the option does not indicate a conditional sale, and respondent's support for this argument is irrelevant.

Respondent's third argument is that the sum of the rental payments and option price approximates the cost of the computer under a deferred payment plan. We find this to be unsubstantiated by the facts. In addition respondent asks us to compare the rentals paid in the first 2-½ years of the lease term ($2,678,840) with the original purchase price ($2,911,783). We find these figures to be incomparable without considering an interest factor.

Respondent's final argument is that the rental payments materially exceeded the current fair rental value of the computer, especially the first half of the lease term. For support, respondent cites *M & W Gear Co.,* 54 T.C. 385 (1970), affd. 446 F. 2d 841 (1971). In that case this Court found that the "rent" paid was more than twice the fair rental value. *M & W Gear Co., supra* at 394. In this case petitioner investigated the rental terms of IBM and Boothe and found Boothe's to be lower. In addition these payments were not challenged by Government auditors when the contract costs were reviewed.

In this area we also consider relevant the type of property involved. During the period in issue new developments in computer technology were rapid. Obsolescence could be virtually an overnight event. We believe this accounts for the higher front-end rental payments. On these facts we find the rental payments to be comparable with the fair rental value of the computer. Based on this we also find that the payments were for the use of the computer and that petitioner was not building up any equity.

Petitioner relies heavily on the recent decisions of this Court in *Lockhart Leasing Co., supra,* and *Northwest Acceptance Corp., supra.* While these cases both dealt with the lessor and the interpretation of many leases, we agree that the factual circumstances are very similar. Since these cases characterized the lessor's transactions as leases, we find them as added support for treating the lessee in the same manner.

After careful consideration of the economic substance of this transaction we hold that petitioner entered into a lease agreement with Boothe to acquire the use of the computer, and therefore petitioner is entitled to deduct the payments to Boothe as rentals within the terms of section 162(a)(3).

*Decision will be entered under Rule 155.*