ADERHOLT SPECIALTY COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Aderholt Specialty Co. v. Commissioner
Docket No. 21357-81.
United States Tax Court
T.C. Memo 1985-491; 1985 Tax Ct. Memo LEXIS 140; 50 T.C.M. (CCH) 1101; T.C.M. (RIA) 85491; September 19, 1985. Thomas W. Harris, Jr., and John E. Short, for the petitioner. Thomas M. Rohall, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal corporate income tax for its taxable year ending June 30, 1978 in the amount of $2,803. The sole issue for decision is whether petitioner is entitled to carry forward the unused balance of an investment credit claimed in an earlier year. Resolution of this issue turns upon whether the property for which the credit was claimed (an airplane) was disposed of less than three years after it had been acquired, requiring recomputation of the credit (and effectively denial of the carryover) *142 under section 47. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found.The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner's principal place of business was Modesto, California, at the time it filed its petition in this case. Petitioner timely filed its United States corporate income tax return for its fiscal year ended June 30, 1978, with the Internal Revenue Service Center at Fresno, California. Prior to August 31, 1977, H & H Management Corporation (H & H) was the parent corporation of Aderholt Specialty Company (Old Aderholt). H & H was organized in 1973 to provide management services to its wholly owned subsidiary, Old Aderholt. Old Aderholt had been formed in 1964, incorporating Herbert T. Aderholt's successful drywall construction business. On August 31, 1977, Old Aderholt was merged into H & H and changed its name to Aderholt Specialty Company *143 (New Aderholt or petitioner). Herbert T. Aderholt (Mr. Aderholt) was president of Old Aderholt, H & H, and New Aderholt. Mr. Aderholt and his wife, Helen Aderholt, owned 98 percent of the New Aderholt stock. During June of 1973, H & H [2] purchased a new 1973 North American Rockwell Air Commander Turbo 690 airplane (the airplane). Mr. Aderholt signed the purchase order for H & H on June 29, 1973, calling for a total purchase price of $503,000, plus sales tax of $25,150, with a cash down payment of $78,150 and the balance of $450,000 to be financed. On July 13, 1973, Mr. Aderholt, on behalf of H & H, executed a note and a security agreement in the seller's favor, which the seller immediately assigned (with recourse) to the Bank of America. The note was payable in 120 monthly installments of $5,718.78 each. H & H acquired the airplane as a separate business investment, not for use in Old Aderholt's construction business. Mr. Aderholt never personally used the airplane. H & H's purchase of the airplane was part of a tax-advantaged investment plan orchestrated by Capital Planning Associates *144 (Capital) that called for the airplane to be leased to Capital for 84 months with an option of an additional 12 months. Capital gave H & H a summary of the proposed tax advantages of the purchase and lease of the airplane, which showed substantial tax losses in the early years, including an investment tax credit of $35,000 in the first year. On June 29, 1973, H & H entered into an aircraft lease with Capital calling for monthly payments of $6,218.80. The lease was a "net" lease under which Capital was to pay all registration, title and license fees, taxes and the like, and all operating expenses. Capital agreed to obtain liability insurance on the airplane of $2,000,000, to obtain "All-Risk Hull insurance including comprehensive ground and crash coverage" of $503,000 (the aircraft purchase price), and to name H & H as co-insured on these policies. At the end of the lease, Capital was to pay to H & H $103,000 and return the airplane to H & H. Unfortunately for H & H, Capital defaulted on the lease after only a few months and subsequently went bankrupt. H & H repossessed the airplane and had to pay a repair bill of approximately $20,000 that Capital had incurred. After Capital's *145 default, Mr. Aderholt wanted to dispose of the airplane and terminate the leasing venture. H & H would have sold the plane if it could have found a buyer, but it was unable to find a buyer at that time. H & H sought unsuccessfully to obtain a long-term lease comparable to the Capital lease. H & H was able to lease out the airplane on a month-to-month basis for a few months. In March of 1976, H & H transferred the airplane to Stanislaus Air Leasing Corporation (Stanislaus) in exchange for all of the stock of Stanislaus. H & H transferred to other assets to Stanislaus. Mr. Aderholt was also president of Stanislaus. Mr. Aderholt formed Stanislaus on the advice of his attorney to insulate his drywall construction business from liability for the airplane activities. Also in March of 1976, Mr. Aderholt was contacted by Frank Lambe (Lambe) of Fresno, California, an airplane distributor or broker. Lambe informed Mr. Aderholt that he had a party, J & W Partnership, interested in the airplane. On or about March 16, 1976, Stanislaus entered into a commission agreement with Lambe that recited that Stanislaus-- * * * desiring to sell said aircraft has entered into negotiations with J & *146 W, A California General Partnership for the lease of said aircraft, said lease containing provisions wherein said aircraft may be purchased and sold to J & W, Partnership at the option of [Stanislaus] or J & W, Partnership; It being fully understood by all parties concerned that such lease will in all likelihood result in the sale of said aircraft by [Stanislaus] to J & W, Partnership. [Emphasis supplied.] Stanislaus agareed to pay Lambe a commission of $25,000 "payable on execution and delivery of said lease." The agreement, however, further provided that-- * * * in the event that the hereinabove described lease provisions establishing the option to purchase and sell are not exercised and no transfer of ownership between [Stanislaus] and J & W, Partnership occurs, [Lambe] agrees to return to [Stanislaus] the sum of Ten thousand dollars ($10,000.00) as a partial return of the sales commission, it being fully understood that such commission is for services in negotiating a lease which will result in the sale of said aircraft. [Emphasis supplied.] That commission agreement was drafted by petitioner's present counsel, Thomas W. Harris, Jr., of Fresno, *147 California, and was executed by Mr. Aderholt (for Stanislaus) and by Lambe. There is no evidence that any part of Lambe's sales commission was ever refunded to Stanislaus. On or about March 17, 1976, Stanislaus and J & W Partnership (hereinafter referred to as J & W) executed an agreement dated March 17, 1976, entitled "Lease of Aircraft" concerning the airplane. The agreement called for Stanislaus to deliver the airplane to J & W at Fresno, California, on March 15, 1976. The agreement called for a "lease" term of 52 months, from March 15, 1976 to July 15, 1980, a date slightly more than seven years after H & H's initial purchase of the airplane. Under the agreement, J & W agreed to pay Stanislaus a total of $274,501.44, payable $5,718.78 per month through February of 1980. The $5,718.78 monthly payment represented the exact amount of the monthly installments H & H or Stanislaus still owed to Bank of America on the airplane. The $274,501.44 lump sum amount represented such monthly payments for 48 months only. J & W also agreed to pay all maintenance, repairs, operating expenses, and taxes. J & W agreed to obtain liability insurance of $2,000,000, naming Stanislaus as an additional *148 named insured. J & W also agreed to obtain hull insurance on the airplane in the amount of $363,690 (the unpaid principal balance of the purchase money debt for the airplane), also naming Stanislaus as co-insured. [3] Paragraph 15 of the agreement between Stanislaus and J & W provided as follows: [Stanislaus] hereby expressly grants to [J & W] an absolute option to purchase said aircraft at termination date of this lease, and said option shall be on the following terms: purchase price payment in cash in the amount of the unpaid loan balance with Bank of America secured by this aircraft. [J & W] shall give to [Stanislaus] at least sixty (60) days' notice of its intention to exercise said option. * * * A letter dated March 15, 1976 addressed to J & W's principals (Mr. Robertson and Mr. Siroonian) in Fresno, California, and signed by Mr. Aderholt (on *149 behalf of Stanislaus) provided as follows: In further consideration for entering into the lease agreement between Stanislaus Air-Leasing Corporation and J & W Partnership for the lease of that certain 1973 North American Rockwell Aero Commander Airplane, it is agreed that the lease provision granting an option to purchase and designated as number 15 of said lease is hereby amended to read: Lessor [Stanislaus] hereby expressly grants to Lessee [J & W] an absolute option to purchase said aircraft such option to be exercisable after March 15, 1977, and to continue therefrom and until the termination of the period covered by this lease, and reciprocally Lessee hereby grants to Lessor the absolute option to sell said aircraft to Lessee such option to be exercisable at termination of the lease period covered herein. In the event that either such option shall be exercised, such option shall be on the following terms: purchase price payment in cash in the amount of the unpaid loan balance with Bank of America secured by this aircraft. Lessee shall give to the Lessor at least sixty (60) days' notice of its intention to exercise said option. * * * [Emphasis supplied.] This letter *150 was signed by Mr. Aderholt and datelined Modesto, California. Both of J & W's principals also signed this letter, indicating their acceptance of this "amendment;" their signatures, however, are undated. Presumably, this letter was mailed from Modesto to Fresno, and should have been signed by the J & W principals in Fresno a day or two later. Neither Mr. Aderholt nor J & W's principals participated actively in the negotiation of this agreement; all relied mainly upon their attorneys and accountants. Both the commission agreement with Lambe and the "lease" agreement between Stanislaus and J & W were prepared by Thomas W. Harris, Jr. (Harris), the attorney for the various Aderholt corporations. The record does not establish whether or not he drafted the letter dated March 15, 1976, which contained the amendment to the lease agreement. On its partnership return (Form 1065) for its calendar year 1976 prepared by its accountant, J & W claimed depreciation of $56,859 on the airplane based upon a cost basis of $363,900 and a useful life of 8 years. J & W also deducted interest expense of $26,499 with respect to the airplane. J & W, however, did not claim an investment credit or rental *151 payments with respect to the plane. The amounts of these claimed deductions total $83,358.30, substantially in excess of the payments that J & W was required to pay Stanislaus ($5,718.78 x 10 months, or $57,187.80 during the remainder of J & W's calendar year 1976). On its corporate income tax returns (Forms 1120) for its fiscal years ending February 28, 1977 and February 28, 1978, Stanislaus reported rental income and claimed depreciation and interest expense from the airplane. J & W was dissolved sometime during 1978, and John Siroonian (Siroonian), one of J & W's principals, incorporated his interest as J Advertising, Inc., John Siroonian, Inc., or J.H. Siroonian, Inc. Siroonian's partner, Wilbur S. Robertson (Robertson), departed; it appears that J Advertising, Inc., or another of the Siroonian corporations continued to make the required payments to Stanislaus. Apparently the monthly payments continued beyond the February 15, 1980 termination date indicated in the lease agreement. On July 18, 1980, Harris, the attorney for Stanislaus, sent a letter to Siroonian and Robertson informing them that the "lease" had expired and that Stanislaus had arranged for J & W to redeliver *152 the airplane in Fresno (for J & W's convenience), rather than in Modesto as called for in the agreement. The letter also asked if Siroonian and Robertson were interested in entering into a new lease agreement. The letter was silent with respect to J & W's purchase option, and was silent with respect to any option of Stanislaus to require J & W to purchase the airplane. On July 31, 1980, Mr. Aderholt, purporting to act for H & H, purported to sell the airplane "as is" and with no warranties to John Siroonian, Inc., or to J.H. Siroonian, Inc.[4] In any event, the balance of the purchase money note held by Bank of America was paid off on July 31, 1980. The record does not establish what happened to Stanislaus but apparently the corporation continued in existence after 1980. *153 In 1973 and 1974, before Stanislaus was incorporated and before the airplane was transferred to it, H & H claimed an investment tax credit on the airplane, using a seven-year useful life. The investment credit available to H & H for its fiscal year ending June 30, 1974 was $36,971. [5] Due to H & H's tax limitations, however, none of the available credit was used until its fiscal year ended June 30, 1977. During H & H's fiscal year ended June 30, 1977, $6,237 of the available credit was used to reduce its tax liability. On its return for its fiscal year ending June 30, 1978 (the taxably year in issue), New Aderholt, H & H's successor by merger, claimed $20,632 of the unused credit. In his statutory notice, respondent made various adjustments not at issue in this case. Respondent also allowed petitioner a targeted jobs credit under section 51 that it had not claimed on its return. These adjustments resulted in a deficiency of $2,803, without the benefit of petitioner's claimed investment credit carryover. Respondent disallowed the claimed investment *154 credit carryover because "the property for which the credit was claimed was sold in a prior year and before the expiration of the required 3-year holding period." [6]
ULTIMATE FINDING OF FACT The letter dated March 15, 1976 from Mr. Aderholt to J & W's principals, who signed the letter indicating their acceptance of the amendment contained therein, constituted an amendment to the lease agreement dated March 17, 1976, and was part of the March 1976 agreement between Stanislaus and J & W. OPINION The parties' stipulation of facts suggests that H & H properly claimed the investment tax credit for its fiscal year ending June 30, 1974; in his pretrial memorandum, respondent conceded this point. In his post-trial brief, however, respondent questioned the initial allowability of the credit, arguing that the airplane was merely a tax shelter that turned sour and not a business asset qualifying for the credit. We will not countenance respondent's belated effort to inject a *155 new issue in the case. SeeSeligman v. Commissioner,84 T.C. 191, 197-198 (1985), and cases cited therein. Even if we were to address the tax-shelter question, respondent would have failed to carry his burden of proof on this new matter. Rule 142(a). The evidence, sparse though it is, indicates that H & H's airplane acquisition was a profit-motivated business investment. The net lease with Capital promised H & H a positive cash flow of about $6,000 per year, a substantial payment ($103,000) at the end of the lease term, and ultimate possession of the plane, which H & H could then sell or lease again. [7]
As in effect at the time petitioner's predecessor (H & H) acquired the airplane, the tax law allowed an investment credit of seven percent of the taxpayer's "qualified investment." Secs. 38, 46(a)(1). A taxpayer's qualified investment for any taxable year included *156 the "applicable percentage" of the basis of each new qualifying property ("section 38 property") [8] placed in service by the taxpayer during the taxable year. Sec. 46(c)(1)(A). The "applicable percentage" depended upon the depreciable useful life of the property for which the credit was claimed. Sec. 46(c)(2). [9] Thus, by claiming a useful life of seven years for the airplane, H & H laid the groundwork for the seven percent investment credit to be applied to 100 percent of its basis in the airplane for its fiscal year ending June 30, 1974. A taxpayer was allowed to carry back or carry forward the unused portion of its investment credit for the given taxable year. Sec. 46(b). H & H could not use its claimed investment credit in the year it acquired the airplane. Since H & H was newly formed, it attempted to carry forward its unused claimed investment credit to the taxable year in issue through petitioner, its successor by merger. *157 If a taxpayer disposes of the property for which it claimed the investment credit before the end of the useful life upon which the credit was based, however, it must recompute the credit using the actual life as the useful life rather than the claimed useful life. Sec. 47(a)(1). If this recomputation reduces or eliminates the allowable credit, any portion of the credit allowed must be recaptured in income, and any unused portion, reflected as a claimed carryover, must be reduced accordingly. Sec. 47(a)(1); sec. 1.47-1(a)(1), Income Tax Regs.Seesec. 1.47-1(d), Example (3), Income Tax Regs. Thus, if respondent correctly determined that H & H disposed of the airplane less than three years after acquiring it, the recomputed credit would be zero [10] and there would be no unused credit to carry over to the taxable year in issue. Respondent's primary argument [11] in support of his position is that the purported lease from Stanislaus to J & W was, for tax purposes, a sale. *158 Section 1.47-2(b)(1), Income Tax Regs., provides in pertinent part: * * * [G]enerally the mere leasing of section 38 property by a lessor who took the basis of such property into account in computing his qualified investment for the credit year shall not be considered to be a disposition. However, in a case where a lease is treated as a sale for income tax purposes such transaction is considered to be a disposition. * * * There are numerous cases involving the question of whether a purported lease is to be recharacterized as a conditional sale. Many different factors have been identified and relied upon in resolving this question. See Simonson, Determining Tax Ownership of Leased Property, 38 Tax Lawyer 1 (1984). Without undertaking exhaustive analysis of the case law, two clear points appear. First, if the nominal lessor "retains significant and genuine attributes of traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes." Frank Lyon Co. v. United States,435 U.S. 561, 584 (1978). However, if the benefits, obligations, and rights of the putative lessor are essentially those of a secured seller, the substance *159 of the arrangement must govern and it will be deemed a sale for tax purposes. Swift Dodge v. Commissioner,692 F. 2d 651 (9th Cir. 1982), revg. 76 T.C. 547 (1981); [12]Smith v. Commissioner,51 T.C. 429, 438-439 (1968). In many cases, the dividing line between a sale and a lease is murky and difficult to discern. In this case, however, the determination *160 rests upon the proper construction of the agreement between Stanislaus and J & W by which J & W obtained possession and use of the airplane. Many of the risks and burdens of ownership (insurance, operating expenses, and taxes) were passed to J & W through the purported "net lease." Similarly, J & W's purchase "option" gave it a significant benefit of ownership--the right to whatever value the airplane possessed at the end of the agreement in excess of the option price. The option price was the unpaid loan balance of the purchase money indebtedness on the airplane incurred by H & H, Stanislaus' predecessor in interest. That option price, under a normal loan amortization, should have been approximately $180,000 at the end of the lease period. Neither the "net lease" nor the "lessee's" purchase option necessarily mandates the conclusion that the agreement was really a sale. SeeFrank Lyon Co. v. United States,supra,435 U.S. at 567; LTV Corp. v. Commissioner,63 T.C. 39, 49-50 (1974); Northwest Acceptance Corp. v. Commissioner,58 T.C. 836, 847-848 (1972), affd. per curiam 500 F. 2d 1222 (9th Cir. 1974); Lockhart Leasing Co. v. Commissioner,54 T.C. 301, 303-304, 314 (1970), *161 affd. sub nom. Lockhart Leasing Co. v. United States,446 F.2d 269 (10th Cir. 1971). We think the determinative factor in this case is the simultaneous or at least the virtually simultaneous amendment of the lease agreement. If, as respondent argues, Stanislaus and J & W had reciprocal options, then Stanislaus had the power to compel J & W to purchase the aircraft at the option price at the termination of the lease period. Under this view, Stanislaus would have relinquished to J & W both the risk of depreciation and the benefit of appreciation at the end of the "lease" term, as well as all operating risks during the "lease" term. Thus, Stanislaus' risk would be identical to that of a secured seller--the risk of the buyer's default. Accordingly, the agreement would be a sale for tax purposes. Swift Dodge v. Commissioner,supra,692 F. 2d at 654; Smith v. Commissioner,supra,51 T.C. at 439. If, however, Stanislaus could not compel J & W to purchase the airplane, then Stanislaus retained the risk that the value of the airplane at the end of the "lease" would be less than the option price. [13] Respondent appears to concede *162 that if Stanislaus retained the risk of depreciation, then it should be respected as a true lessor. See also Simonson, Determining Tax Ownership of Leased Property, supra, 38 Tax Lawyer at 3, 2024. We agree with respondent's construction of the agreement between Stanislaus and J & W. Mr. Aderholt was contacted by Frank Lambe, the airplane broker, only after Lambe had already lined up J & W as a party interested in the airplane. The commission agreement between Stanislaus and Lambe, dated March 16, 1976, expressly called for reciprocal purchase and sale options. The commission agreement also called for a refund to Stanislaus of $10,000 of the sales commission if the lease agreement *163 did not result in a sale of the airplane, and petitioner did not present any evidence that any such refund was ever made. Although the lease agreement dated March 17, 1976 between Stanislaus and J & W gave a purchase option only to J & W, we think that the parties either simultaneously or virtually simultaneously amended the March 17, 1976 agreement (by the letter of March 15, 1976) to provide for the reciprocal options. There is no evidence that the March 17, 1976 lease agreement was in fact executed on March 17, 1976. There are terms in the lease agreement that show it was intended to be effective as of March 15, 1976: (1) the airplane was to be delivered to J & W on March 15, 1976; (2) the rental payments were to begin on March 15, 1976 and to run to February 15, 1980; and (3) the overall lease term was to run from March 15, 1976 to July 15, 1980. Moreover, the letter of March 15, 1976 containing the amended option clause was signed by Mr. Aderholt, datelined Modesto, California, and addressed to the two J & W principals in Fresno, California. The two J & W principals signed the letter accepting the terms of the amendment but did not date their signatures. We are satisfied *164 that the parties agreed to that amendment. The amendment gave J & W the right to exercise its purchase option at any time after March 15, 1977 (the end of the first year of the lease), whereas the option provision in the March 17, 1976 lease permitted the exercise of the option only at the end of the lease term; the amendment also included Stanislaus' option to sell to J & W at the end of the lease term as contemplated when Stanislaus began dealing with Lambe, the broker who brought J & W and Stanislaus together. Thus, while the signatures of J & W's principals on the letter of March 15, 1976 are not dated, we think it is likely that the amendment was signed by them contemporaneously with the execution of the lease agreement dated March 17, 1976, or very shortly thereafter. Needless to say, we are wholly unpersuaded by Mr. Aderholt's attempt (following considerable prompting by petitioner's counsel) to characterize the March 15 letter as a proposed amendment to an earlier proposed agreement. The amendment was not just a proposal; it was executed by the same three individuals who signed the lease agreement. It was clear to the Court that Mr. Aderholt had little or no independent *165 recollection of the events, and that his testimony was largely conclusory statements suggested by counsel for both parties. We are also unpersuaded by petitioner's insistence upon what it regards as the discrepancy between the dates of the amendment (March 15, 1976) and the "final" agreement (March 17, 1976), for which there are numerous plausible explanations in addition to those suggested by the apparent mailing of the document from Modesto to Fresno. Since the lease agreement was to be effective March 15, 1976, the letter amendment may have been back-dated to March 15, 1976 to ensure its effectiveness from the outset. Alternatively, Stanislaus may have executed the lease agreement on March 15, 1976, immediately discovered the error in the option clause, and executed an amendment the same day; J & W could have executed both the lease agreement and the amendment on March 17, 1976. Also the fact that the commission agreement is dated March 16, 1976, the day after the letter containing the amended option clause and the day before the date shown on the lease agreement, satisfies the Court that any discrepancy in date is wholly meaningless. The Court has concluded from the record *166 as a whole that the letter amendment is part and parcel of the agreement between Stanislaus and J & W. Mr. Aderholt reluctantly admitted that the lease agreement dated March 17, 1976 was the only agreement executed by the parties and the only one to which an amendment could pertain. We also accord no weight to the conclusory testimony of Mr. Aderholt and Mr. Siroonian (one of J & W's partners) that they did not believe Stanislaus could force a purchase. The documents indicate otherwise. Moreover, neither Mr. Aderholt nor Mr. Siroonian actively engaged in the negotiation and drafting of the agreement between Stanislaus and J & W, both instead relying on their attorneys and accountants. Petitioner's attorney, Thomas W. Harris, Jr., who prepared both the Lambe commission agreement and the lease agreement, should have been able to explain the relation between the March 15 amendment and the March 17 lease agreement, but he did not testify. Although his failure to testify may have been prompted by considerations of professional ethics, [14] nonetheless, petitioner must bear the burden of its failure of proof. Rule 142(a). *167 Finally, we remain unpersuaded by petitioner's insistence that J & W did not purchase the airplane. J & W was dissolved in 1978, long before the end of the lease agreement. Nonetheless, J & W's liabilities continued in its partners, including Siroonian. Uniform Partnership Act (UPA), secs. 15, 36(1) (West 1969), Cal. Corp. Code secs. 15015, 15036(1) (West 1977). Absent the consent (expressed or implied) of Stanislaus, Siroonian's incorporation of his share of the old J & W partnership did not discharge his partnership liability for J & W's obligations to Stanislaus. UPA, sec. 36(3); Cal. Corp. Code sec. 15036(3). SeeCredit Bureaus of Merced County, Inc. v. Shipman,167 Cal. App. 2d 673, 334 P. 2d 1036 (1959); Geisenhoff v. Mabrey,58 Cal. App. 2d 481, 137 P. 2d 36 (1943). See generally, 8 Fletcher Cyc. Corp., sec. 4019 (Rev. 1982). J & W's obligation to purchase the airplane was not terminated; rather, it continued in Siroonian, in one of his corporations, or in both. See UPA, sec. 41(2), (4), (8); Cal. Corp. Code sec. 15041(2), (4), (8). That Mr. Aderholt, purporting *168 to act for H & H (which had been merged into Old Aderholt three years earlier) and Mr. Siroonian avoided any mention of any option to acquire or require purchase in their brief dealings leading up to the ultimate "purchase" of the airplane in 1980 is of little weight in this case. That threeline, handwritten "purchase" agreement does not even mention a price. As noted in our findings of fact, we accord little or no weight to these events in 1980 during or shortly before the audit in this case. Moreover, we cannot ignore J & W's treatment of the transaction on its return as a sale instead of a lease. J & W depreciated the airplane on a cost basis of $363,900 and a useful life of eight years. We accord more weight to those actions back in 1976 than to Mr. Siroonian's protestations at the trial of this case many years later. Even on the matter of who allegedly purchased the plane in 1980, he insisted that he personally purchased it. While the informal handwritten "purchase agreement" contains scant information, it does identify the party as one of his corporations, although it is not wholly clear as to which one. In conclusion, the purported lease in this case expired shortly *169 after the seven-year period during which investment credit recapture would occur if the section 38 property was sold. The "lease" payments and "option price" exactly equalled H & H's purchase obligation on the airplane. The purported lease also granted Stanislaus the power to compel sale of the airplane to the "lessee" at the end of the "lease" term. This transaction divested Stanislaus of any "significant and genuine attributes of traditional lessor status." Frank Lyon Co. v. United States,supra,435 U.S. at 584. Consequently, the lease agreement in this case was a sale for Federal tax purposes, and hence, petitioner is not entitled to an investment credit carryover.[15]
Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all references to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
2. The letters "H & H" in the corporation's name refer to Herbert and Helen Aderholt.↩
3. In the event of total destruction of the airplane, the $363,690 was to be paid to Stanislaus, and J & W's monthly payments were to terminate; in the event of less than total destruction the hull insurance proceeds were to be paid to J & W and J & W's monthly rental payments were to continue during any period of repair.↩
4. At the trial Mr. Siroonian insisted that he personally purchased the airplane, but the written sales agreement, informal though it is, flatly contradicts him. Also Mr. Aderholt's testimony that Stanislaus sold the airplane is also contradicted by the fact that he signed the written sales agreement as president of H & H Management Corp. That corporation had been merged with Old Aderholt to form New Aderholt back in 1977. The Court accords little or no weight to these events in 1980 about the purported sale of the airplane at that time. It seems quite likely that these events occurred after the tax audit had begun.↩
5. That figure was computed by H & H as 7 percent of $528,150 (the original purchase price of $503,000 plus sales tax of $25,150).↩
6. If we hold that the investment credit carryover is available to petitioner, then that credit supersedes the targeted jobs credit, which will then carry over to subsequent years. See secs. 53(a), 53(c).↩
7. We agree with petitioner that the tax-shelter argument is a "red-herring" in this case. Unfortunately, petitioner baited the hook in its pretrial memorandum by describing Capital as being in the tax shelter business. Respondent's counsel fished the waters vigorously but failed to make a catch.↩
8. The airplane H & H purchased was qualifying property at the time of its purchase--depreciable tangible personal property with a useful life of three years or more. See secs. 46(c)(1), 48(a)(1), 48(b). ↩
9. Section 46(c)(2) provided as follows: (2) Applicable Percentage.--For purposes of paragraph (1), the applicable percentage for any property shall be determined under the following table: The applicable
If the useful life is--
percentage is--
3 years or more but less than 5 years
33 1/3
5 years or more but less than 7 years
66 2/3
7 years or more
100
For purposes of this subpart, the useful life of any property shall be the useful life used in computing the allowance for depreciation under section 167 for the taxable year in which the property is placed in service.↩
10. Property must have a useful life of at least three years to qualify for the credit. Secs. 46(c)(2), 48(a)(1). ↩
11. Respondent's initial argument is that H & H's transfer of the airplane to Stanislaus was an early disposition within the meaning of section 47(a)(1), triggering a recomputation and recapture of the investment credit. Petitioner counters that the transfer comes within the exception for "a mere change in the form of conducting the trade or business." Sec. 47(b); sec. 1.47-3(f)(1)(ii), Income Tax Regs.; Loewen v. Commissioner,76 T.C. 90↩ (1981). For purposes of this opinion, we assume, without so deciding, that petitioner is correct, and we will focus on respondent's principal argument.
12. In Swift Dodge v. Commissioner,76 T.C. 547, 573 (1981), we concluded that the taxpayer had "retained risks and responsibilities commensurate with the status of a lessor." The Ninth Circuit Court of Appeals disagreed, however, concluding that there were "no essential differences between this transaction and a conditional installment sale with a lump sum final payment." 692 F. 2d 651, 654 (9th Cir. 1982). The agreement in the instant case is different from the open ended automobile leases in Swift Dodge.↩ Both this Court and the Ninth Circuit accept the basic principle that if a nominal lease is in substance a sale, it will be treated as a sale for tax purposes. Moreover, any appeal in this case would lie to the Court of Appeals for the Ninth Circuit.
13. If the option price exceeds the airplane's expected fair market value, as respondent argues, then the risk of depreciation is very real. The record does not indicate that Stanislaus and J & W ever undertook to project the value of the airplane at the end of the "lease" term. Moreover, petitioner presented no evidence regarding the actual residual value of the airplane. Rule 142(a). We think it significant that the purported "purchase" agareement in 1980 was wholly silent as to price.↩
14. See A.B.A. Model Code of Professional Responsibility, Canon 5, DR 5-101(B), DR 5-102, EC5-9, EC-10. Since petitioner was represented at trial by other counsel, Harris could have withdrawn and appeared as a witness to explain the preparation of the documents without imposing any unreasonable hardship on petitioner. See EC5-10.↩
15. In light of our holding, it is unnecessary to address respondent's alternative arguments.↩